NO. 07-10-00313-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

MARCH 22, 2011

_____

IN THE INTEREST OF N. R. T., A CHILD

_____

FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;

NO. 74,346-D; HONORABLE DON R. EMERSON, JUDGE

_____

Before CAMPBELL and PIRTLE, JJ., and BOYD, S.J.[1]

**OPINION**

Appellants P.T., the father, and C.T., the mother, appeal the July 2010, final order of the trial court terminating their parental rights to N.R.T. and appointing appellee the Texas Department of Family and Protective Services permanent managing conservator of the child. We will affirm the order of the trial court.

Background

N.R.T. was born January 27, 2006. During May and June 2006, the father was sentenced to six years confinement in prison for robbery and one year in a State jail facility for failing to register as a sex offender. In September 2007, the mother was

---

[1] John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

sentenced to four years in prison for robbery. The mandatory release date for the father is June 2012, and May 2011 for the mother.

When the mother was jailed, N.R.T. was left in the care of her paternal grandmother C.S. In June 2007, the Department opened a case regarding N.R.T. when C.S. tested positive for cocaine and marijuana, and was found to be caring for the child while intoxicated. A hair follicle drug analysis of N.R.T. was also positive for cocaine. The Department was appointed N.R.T.'s temporary managing conservator and placed her in the foster care of K.V.

The trial court convened a disposition hearing in the case on December 12, 2008. The father and the mother appeared in person with appointed counsel. The Department's live petition sought termination of the parental rights of the father and the mother on multiple predicate grounds. Counsel for the Department announced an agreement among the parties whereby the Department would become the permanent managing conservator of N.R.T., the father and the mother would pay child support beginning January 1, the father and the mother would have "no visitation at the time, no possessory conservatorship" with the status modified "at the time they get out of prison, assuming that they show themselves to be fine, decent, upstanding people," and N.R.T. would possibly be placed with her maternal grandmother, J.G., depending on the outcome of an evaluation of her home. The trial court signed the resulting order on February 9, 2009. The order was entitled "final order" and provided "that all relief requested in this case and not expressly granted is denied."

The Department evaluated the home of J.G. as a possible placement for N.R.T., but did not approve the placement. According to J.G., her home was not approved because her twenty-year-old daughter, who then lived in the home, refused a hair follicle drug analysis.

In April 2009, the foster mother K.V. filed a plea in intervention in the case seeking adoption of N.R.T. K.V. filed a pleading in June 2010, seeking termination and adoption.

On December 31, 2009, the Department filed a pleading seeking termination of the parental rights of the father and the mother to N.R.T. The case was tried to the bench on June 25, 2010. Before the presentation of evidence commenced, counsel for K.V. verbally withdrew her live plea in intervention to prevent a continuance. N.R.T.'s caseworker testified for the Department. She told the court that since December 2008, the father sent N.R.T. one birthday card; otherwise, neither parent contacted N.R.T. According to K.V., the mother sent N.R.T. a note before her imprisonment; otherwise, K.V. received no correspondence for N.R.T. According to the caseworker, two days before trial the attorney for the father informed her that unidentified relatives offered a placement for N.R.T. In the opinion of the caseworker, termination of the parental rights of the father and the mother was in the best interest of N.R.T. because "[s]he has not known her parents. She has not been able to bond with her parents. And she has been in the foster home, and has bonded and attached. She sees [K.V.] as her mother." The Department intended to seek adoption of N.R.T. by K.V. if the court granted termination. The caseworker agreed that although the father and the mother were ordered to make

child support payments by the February 2009 order it was "reasonably anticipated" they could not comply because of their incarceration.

The mother testified she has three other children. At the time, they were in the care of her grandparents. She had not seen N.R.T. since May 2007 and acknowledged knowing nothing of her daughter's interests since age one. The mother had not sent N.R.T. cards since 2007. Since February 2009, the mother received four or five letters from the father concerning N.R.T. While in prison the mother completed a parenting class, earned a G.E.D., and began a computer class. As for her plans on release from prison, the mother indicated she intended to attend school. She planned to live with her mother. When asked how she could support four children, the mother explained she would find a job and receive help from her family.

The father testified that N.R.T. is his only child, and that he cared for her for three months until he went to prison. He knew his daughter liked the movie *The Little Mermaid* and was aware she took medication for A.D.H.D. and sleep and received physical therapy for a foot condition. According to the father, he sent N.R.T. drawings, cards, and letters through the Department caseworker but received no acknowledgment of receipt. Sometime after January 2010, he sent the Department letters identifying his mother and siblings as alternative placements. He believed he provided the Department his mother's new address and telephone number. The father said he wrote the Department several times with no response, and that since February 2009 he had written his mother-in-law J.G., the Department, and the mother, and while in the county jail on a bench warrant telephoned his mother, all concerning N.R.T. Asked how he

4

could provide a home for N.R.T. while in prison, the father explained he would like the child placed with his mother C.S., "now that she's cleaned herself back up." By this he meant she was "struggling" to complete probation having been convicted "of cocaine." His mother once received in-patient psychiatric care. He added that his father and the mother's family could provide financial assistance and other relatives would lend "physical and emotional" support. The Department denied a home evaluation of his father because of an unspecified criminal record. When released from prison, the father planned to live with his mother until he was able to rent a home. He intended to work at his uncle's paint and body shop. On cross-examination, the father indicated he had not sought financial support from his family for N.R.T. because "the Department seems to have everything under control with x-ing (sic) us out of the situation."

The trial court's final order terminated the parental rights of the father and the mother to N.R.T. It found termination was in the best interest of N.R.T. and the father committed the predicate acts specified by Family Code § 161.001(a)(N),(O) and (Q) and the mother committed the acts specified by § 161.001(a)(N) and (O).[2] The father and the mother each appeal.

Analysis

Pleading deficiencies

By their first issues, the father and the mother assert the trial court lacked authority to terminate their parent-child relationship with N.R.T. because the Department grounded its live petition on Family Code § 156.101, governing modification of an

---

[2] *See* Tex. Fam. Code Ann. § 161.001(1)(N),(O),(Q) (West Supp. 2010).

existing order, rather than on § 161.001, governing termination of the parent-child relationship.

The Department's December 31, 2009 pleading, on which termination was granted, was entitled, "Petition to Modify Parent-Child Relationship." In its body, the pleading identified the February 2009 order and alleged the requested modification was the termination of the parental rights of the father and the mother under § 161.001. In specific paragraphs, the pleading alleged in statutory language that the father and the mother each committed multiple predicate acts under § 161.001(1) and termination was in the best interest of N.R.T. Modification was otherwise not mentioned.

A trial court may terminate the parent-child relationship under § 161.001 if the fact-finder finds by clear and convincing evidence that a parent has committed one or more of the enumerated predicate acts and termination is in the best interest of the child. Tex. Family Code Ann. § 161.001(1)(A)-(T),(2) (West Supp. 2010); *In re J.P.B.,* 180 S.W.3d 570, 572 (Tex. 2005). The title of the Department's live petition is not determinative since a court determines the nature of a pleading by its substance and not merely its title. *See State Bar v. Heard,* 603 S.W.2d 829, 833 and n.5 (Tex. 1980) ("[w]e look to the substance of a plea for relief to determine the nature of the pleading, not merely at the form of title given to it"); Tex. R. Civ. P. 71 (misnomer of pleading).

Beyond the pleading's title, its reference to modification does not alter the document's expressed purpose, termination under § 161.001. "Texas follows a 'fair notice' standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will

6

be relevant." *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 896 (Tex. 2000). "A petition for the termination of the parent-child relationship is sufficient without the necessity of specifying the underlying facts if the petition alleges in the statutory language the ground for the termination and that termination is in the best interest of the child." Tex. Fam. Code Ann. § 161.101 (West 2008). There is no record indication that the father or the mother specially excepted to the pleading and received an adverse ruling. The father and mother may not challenge the sufficiency of the Department's live petition for the first time on appeal. *Tullis v. Georgia-Pacific Corp.,* 45 S.W.3d 118, 124 (Tex.App.--Fort Worth 2000, no pet.) (citing Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 90). But the absence of a trial court challenge by the father and the mother is not remarkable since the Department's pleading afforded the father and the mother fair notice that the Department sought termination of parental rights under § 161.001. Neither appellant contends otherwise, and the record makes clear the case was tried on the issue of termination under § 161.001, the trial court signed an order of termination, and the court made supporting findings of fact and conclusions of law. We overrule the first issue of the father and the first issue of the mother.

Legal and Factual Sufficiency Issues

The father and mother challenge the legal and factual sufficiency of the evidence supporting the trial court's findings of predicate conduct necessary for termination and that termination was in the best interest of N.R.T.

When reviewing factual findings required to be made by clear and convincing evidence, we apply a standard of review that reflects this burden of proof. *In re S.M.L.,*

7

171 S.W.3d 472, 476 (Tex.App.--Houston [14th Dist.] 2005, no pet.). A legal sufficiency review requires we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that the finding was true. *Id.* (citing *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002)). In doing so, we assume the fact finder resolved disputed facts in favor of the finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *Id.* However, because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *In re J.F.C.,* 96 S.W.3d at 266 ("[d]isregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence").

A factual sufficiency review, in a proceeding to terminate the parent-child relationship, requires consideration of the entire record to determine whether a factfinder could reasonably form a firm belief or conviction that the reviewed finding was true. *In re C.H.,* 89 S.W.3d 17, 28 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not credit in favor of the finding is so significant that a factfinder could not reasonably form a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient." *In re H.R.M.,* 209 S.W.3d 105, 108 (Tex. 2006) (quoting *In re J.F.C.,* 96 S.W.3d at 266).

Section 156.101(a)(1) has no application.

By their second issue, the father and the mother assert the evidence was legally and factually insufficient to establish a material change of circumstances as required for

8

modification of an existing order under § 156.101(a)(1).  As noted, we conclude the case proceeded to disposition in the trial court as one for termination under § 161.001.  Evidence of a material and substantial change of circumstances is not required for termination under § 161.001.  We will address changed circumstances in our discussion of the application of § 161.004 to this case.  *See* Tex. Fam. Code Ann. § 161.004(a)(2) (West 2008).  We overrule the second issue of the father and the mother, as presented.

Predicate Grounds for Termination

*Constructive abandonment*

By her third issue, the mother challenges the sufficiency of the evidence supporting the trial court's conclusion she constructively abandoned N.R.T.  The parent-child relationship may be terminated if a court finds a parent has:

> Constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than six months, and:
>
> > (i) the department or authorized agency has made reasonable efforts to return the child to the parent;
> >
> > (ii) the parent has not regularly visited or maintained significant contact with the child; and
> >
> > (iii) the parent has demonstrated an inability to provide the child with a safe environment.

Tex. Fam. Code Ann. § 161.001(1)(N) (West Supp. 2010).  It is not disputed that at the time the Department moved for termination in December 2009, it had been N.R.T.'s managing conservator for at least six months.  The mother contests the court's findings the Department made reasonable efforts to return the child to her, she failed to maintain

9

significant contact with the child, and she demonstrated an inability to provide the child with a safe environment.

The mother first points to what she perceives as inconsistency between the terms of the February 2009 order, which denied her possession and access to N.R.T.,[3] and the Department's position that her failure to maintain significant contact with the child supports termination. The Department argues an order denying access to a child does not prevent a parent from communicating with the child by writing.[4] We need not here consider the effect of the February 2009 order on the mother's ability to maintain significant contact with the child because the evidence shows that the level of the mother's contact with N.R.T. was no different before the order than after its rendition. The mother testified to no contact with N.R.T. during 2008, and from her testimony the court could have concluded that at the time of trial she knew little about her daughter. She said she had written the Department to ask about N.R.T., but she could not remember when she wrote last.

With respect to the Department's efforts to return N.R.T. to the mother, there was evidence of service plans. Implementation of a family service plan by the Department is ordinarily considered a reasonable effort to return a child to its parent. *In re M.R.J.M.,* 280 S.W.3d 494, 505 (Tex.App.--Fort Worth 2009, no pet.). To that evidence we add

---

[3] The order contained the court's finding that possession or access by either parent would endanger the physical or emotional welfare of N.R.T. *See* Texas Family Code § 153.191 (requiring such a finding to deny parent possession or access). Tex. Fam. Code Ann. § 153.191 (West 2008).

[4] *Cf. In re Walters*, 39 S.W.3d 280, 284-85 (Tex.App.—Texarkana 2001, no pet.) (discussing elements of right of access to child).

the testimony showing the Department's agreement to the terms of the February 2009 order calling for evaluation of the home of J.G. as a possible placement, and its evaluations of other family members as possible placements. *See In re D.S.A.,* 113 S.W.3d 567, 573 (Tex.App.--Amarillo 2003, no pet.) (returning child to incarcerated parent under § 161.001(1)(N) may include placement with family member); *accord, In re K.J.T.M.,* No. 06-09-0104-CV, 2010 Tex. App. Lexis 3057, at *11 (Tex.App.—Texarkana, April 27, 2010, no pet.) (citing Department's efforts, "although futile," to place child with relatives as supporting finding of reasonable efforts to return child to incarcerated parent).

The evidence the mother demonstrated an inability to provide a safe environment for N.R.T. begins with that showing she left the child in the care of C.S. in 2007. The child was removed when both C.S. and the child tested positive for cocaine. Since the child's removal, her only environment has been that provided through foster care. The February 2009 order contains the trial court's finding that appointment of a relative of the child as managing conservator would not be in the child's best interest. At the hearing that led to the February 2009 order, the Department announced its intention to evaluate the maternal grandmother's home as a possible placement. In a June 2009 placement review hearing, the Department told the court the home study "did not pass," and the caseworker testified to her opinion that it was not in N.R.T.'s best interest that she "go with relatives." The only evidence in the record directly addressing the reason the child was not placed with J.G. is her own trial testimony. As noted, J.G. said her home was not approved because her twenty-year-old daughter, who then lived in the home, refused to submit to a hair follicle drug analysis. The father testified at trial that

the Department "did a home evaluation on [the paternal grandfather] and [the Department] said he was an unfit parent because of his past criminal record."

The mother attempts to avoid the application of our holding in *D.S.A.*, 113 S.W.3d at 573, in which we recognized that an incarcerated parent may provide a safe environment for a child through family members. She argues her situation is distinguished from those described in *D.S.A.* by the terms of the February 2009 order denying her possession and access to N.R.T. We cannot agree that the order either prohibited the mother from providing a safe environment for her child, or excused the consequences of her inability to do so. Indeed, as the mother's brief recognizes, the denial of her possession and access and the evaluation of the maternal grandmother's home were accomplished by the same agreement prior to entry of the February 2009 order.

The trial court's implicit acceptance of the reasons supporting the Department's rejection of each of the suggested placements provided a basis for a firm conviction that no family surrogate was available to provide a safe environment for N.R.T. on the mother's behalf while she remained incarcerated. *See D.S.A.*, 113 S.W.3d at 573. The mother acknowledged she could not provide for N.R.T. while incarcerated. Based on this record, the evidence was legally and factually sufficient to support the trial court's findings that the mother constructively abandoned N.R.T., as described in § 161.001(1)(N). We overrule the third issue of the mother.

12

*Conviction, incarceration, and inability to care for the child.*

By his fifth issue, the father asserts the evidence was legally and factually insufficient to support termination of his rights under § 161.001(1)(Q). Subsection Q provides a basis for termination on a finding that the parent knowingly engaged in criminal conduct that resulted in the parent's conviction for an offense and confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition. Tex. Fam. Code. Ann. § 161.001(1)(Q) (West Supp. 2010). Subsection Q focuses on a parent's future imprisonment and inability to care for the child. "By looking at future imprisonment and inability to care for the child, subsection Q purports to protect children whose parents will be incarcerated for periods exceeding two years after termination proceedings begin." *In re A.V.*, 113 S.W.3d 355, 360-61 (Tex. 2003).

It is not disputed that the father was convicted of a criminal offense in 2006 and by the time of trial in June 2010, was incarcerated for four years, and had a projected "long way discharge" of March 2012. Whether measured from the filing of the Department's initial petition in 2007 or its December 2009 pleading, the father's criminal conduct resulted in his incarceration for a period exceeding two years.[5] But an analysis under subsection Q also considers whether the incarcerated parent will be unable to care for the child during that period. *In re H.R.M.,* 209 S.W.3d at 110 (citing *In re A.V.,* 113 S.W.3d at 360).

---

[5] The father was eligible for parole, and had been considered. The availability of parole is relevant to determine whether an incarcerated parent will be released within two years, but because parole decisions are inherently speculative, its availability does not preclude a firm conviction or belief that the parent will remain incarcerated for at least two years. *H.R.M.*, 209 S.W.3d at 109.

Acknowledging his own inability to care for N.R.T. during his incarceration, the father testified that after the failed home study of his mother-in-law J.G., he sent the department a letter stating his mother C.S. "had cleaned herself up" and more than one sibling was willing to care for N.R.T. He could not recall providing the department the names and addresses of his siblings, however. No sibling of the father testified nor was evidence admitted of an identified sibling of the father willing and capable of caring for N.R.T. The father broadly asserted during his testimony that his family could be relied upon to care for N.R.T. until his release from incarceration, but the evidence of the removal of the child from the paternal grandmother C.S., the Department's concern over the paternal grandfather's unspecified criminal record, and the evidence no other family member had stepped forward at any time during the some three years N.R.T. had been in foster care gave the trial court good reason to discount the assertion. In this bench trial, it was the task of the court alone to assess the credibility and demeanor of those testifying before it. *See, e.g., H.R.M.*, 209 S.W.3d at 109.

J.G. testified at trial. She said her other daughter was no longer in the home and she was willing to accept placement of N.R.T. She gave a positive response to a question asking whether she had the present ability to provide care for N.R.T., and testified to her work schedule. J.G.'s expression of willingness to "take N.R.T." at the time of trial is evidence contrary to a finding the father was unable to care for the child, *see D.S.A.*, 113 S.W.3d at 573, but viewed in its context within the entire record, it is not so persuasive as to render the Department's evidence of the father's inability to care for the child factually insufficient. J.G. said she had not "lately" expressed reservations about accepting the placement, but acknowledged she had done so previously. And

14

she had neither seen nor had any contact or communication with her granddaughter since the child was a year old. Asked if she had sent the child anything, she responded, "I don't even know where [N.R.T.] is." In light of the entire record, and giving deference to the proper role of the fact finder, we find her testimony was not so significant as to preclude the trial court from reasonably forming a firm conviction that the father, individually or through family surrogates, was unable during his incarceration to care for N.R.T. *See H.R.M.,* 209 S.W.3d at 108 (standard for factual sufficiency review).

The father also argues the facts supporting termination under § 161.001(1)(Q) existed before the agreed order of February 2009, and therefore the doctrine of res judicata barred their consideration by the trial court at the June 2010 trial. We disagree. Family Code § 161.004(b) allowed the trial court's consideration of this evidence. Further, as more fully addressed in our discussion of § 161.004(a) below, res judicata did not bar a judgment of termination based on evidence existing at the time of the February 2009 order. On this record, the trial court could have reached a firm conviction that the requirements of § 161.001(1)(Q) were met as to the father, making the evidence legally and factually sufficient. We overrule the father's fifth issue.

Because we conclude sufficient evidence supports the trial court's findings that the mother constructively abandoned N.R.T. and the requirements of § 161.001(1)(Q) were met as to the father, it is unnecessary for us to review the evidence supporting the other predicate grounds for termination found by the trial court. *See In re A.V.,* 113 S.W.3d at 361 (proof of one predicate ground for termination, with finding termination is

in child's best interest, sufficient to support termination); Tex. R. App. P. 47.1 (appellate court must address all issues raised and necessary to disposition of appeal).

Best Interest

In the sixth issue of the father and the fifth issue of the mother, the appellants assert the evidence was insufficient to support the trial court's finding that termination of the parent-child relationship was in the best interest of N.R.T.

The Supreme Court of Texas has identified factors for consideration by the trier of fact in determining whether termination is in the best interest of the child, including: the desires of the child; the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex. 1976). However, these considerations are not exhaustive nor is proof of each a condition precedent to termination of the parent-child relationship. *In re C.H.,* 89 S.W.3d at 27. The best interest analysis evaluates the best interest of the child, not the parent. *In re S.A.P.,* 169 S.W.3d 685, 707 (Tex.App.--Waco 2005, no pet.).

The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-

16

child relationship. *In re C.H.,* 89 S.W.3d at 28; *In re P.E.W.,* 105 S.W.3d 771, 779 (Tex.App.--Amarillo 2003, no pet.). And a best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re S.H.A.,* 728 S.W.2d 73, 86-87 (Tex.App.--Dallas 1987, writ ref'd n.r.e.).

The law recognizes a strong presumption that the best interest of a child will be served by preserving the parent-child relationship. *Swate v. Swate,* 72 S.W.3d 763, 767 (Tex.App.--Waco 2002, pet. denied). But it also recognizes that the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *In re J.F.,* No. 02-08-0183-CV, 2009 Tex. App. Lexis 2130, *17 (Tex.App.--Fort Worth March 26, 2009, no pet.) (mem. op.) (citing Tex. Fam. Code Ann. § 263.307 (West 2002)).

At the time of trial, N.R.T. was over four years old and had been in the foster care of K.V. since she was seventeen months old. According to K.V., the two bonded and N.R.T. thought of K.V. as her mother. N.R.T. called K.V. "mom." K.V. desired to adopt N.R.T. and attempted to intervene in the case for that purpose. N.R.T. was the first foster child in the home of K.V. although by the time of the June 2010 trial K.V. had a second foster child in her care. According to K.V., N.R.T. has asked about her father but not her mother and has made no reference to her grandparents. The Department caseworker stated when asked about her biological parents, N.R.T. grows angry and responds, "'No, my momma is [K.V.].'"

The father and the mother have had no meaningful contact with their daughter since she entered foster care in 2007, either directly by written communication or through their families as surrogates. The father testified he sent mail for her to the Department, but the caseworker's testimony cast doubt on the Department's receipt of such mail. The caseworker testified flatly she had no inquiry from the father about his daughter's welfare since she took the case in June 2009, except in response to the Department's termination pleading.

Neither parent made child support payments or offered monetary support of N.R.T. despite their agreement for child support and evidence of family members capable of providing assistance.

The Department's plan after termination was N.R.T.'s adoption by her foster mother. The father's plan for care of N.R.T. was her placement with his mother C.S. until he or the mother was released from prison. The mother's plan was similar, placement with her mother J.G. until she or the father could resume care of the child.

Although the parties did not so testify, their plans for N.R.T., both before and after their release from prison, hinge on obtaining a modification of the February 2009 order naming the Department permanent managing conservator. Absent modification of the order to authorize the placement plans of the father and the mother, and absent parental termination, N.R.T. will remain in the care of the Department. *See* Tex. Fam. Code Ann. § 153.371(1),(2),(10) (West 2008) (Department as sole managing conservator has the right of physical access of the child, the right to designate the child's primary residence, and the duty of care, control, protection, and reasonable

18

discipline of the child). But maintaining N.R.T. in this state of limbo defeats the legislative intention that children not remain indefinitely in foster homes. *In re M.G.D.,* 108 S.W.3d 508, 515 (Tex.App.--Houston [14th Dist.] 2003, pet. denied).

Considering all the evidence in relation to the best interest factors in the light most favorable to the court's finding, particularly that concerning the need for and lack of meaningful support from family surrogates, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination was in the best interest of N.R.T. And viewing all the evidence in a neutral light, we conclude that the disputed and undisputed evidence favoring and disfavoring the finding permits a reasonable factfinder to form a firm conviction and belief that termination was in the best interest of N.R.T. The evidence supporting the court's finding that termination of the parental rights of the father and the mother was in the best interest of N.R.T. is legally and factually sufficient. *See Holley,* 544 S.W.2d 367; *In re S.M.L.D.,* 150 S.W.3d 754, 756 (Tex.App.--Amarillo 2004, no pet.). We overrule the sixth issue of the father and the fifth issue of the mother.

Res Judicata

Although not expressly assigned as error, the father and the mother intersperse their arguments challenging the legal and factual sufficiency of the evidence with a contention that evidence of events preceeding the December 12, 2008 hearing was

precluded by res judicata. The Department also addresses the issue of res judicata in its brief.[6]

During the June 2010 bench trial, the trial court admonished the parties that it would not consider evidence predating "December 2008." At the conclusion of the trial, the trial court directed the attorneys to submit briefs addressing, among other things, the issue of res judicata. In its brief, the Department argued under § 161.004(b) the court could consider evidence from prior hearings in the case, as well as evidence of events predating December 2008. The court's findings reflect consideration of evidence of facts predating December 2008, but its findings and conclusions do not address res judicata or the requirements of § 161.004(a). In the absence of findings on these ultimate issues, we presume the trial court made all fact findings necessary to support the order of termination. *Smith v. Smith,* 22 S.W.3d 140, 149 (Tex.App.--Houston [14th Dist.] 2000, no pet.).

Ordinarily res judicata bars a subsequent suit if the matters asserted in the subsequent suit arise out of the same subject matter as a previous suit and which matters, through the exercise of reasonable diligence, could have been litigated in the prior suit. *See Barr v. Resolution Trust Corp. ex rel. Sunbelt Federal Sav.,* 837 S.W.2d 627, 631 (Tex. 1992). But we agree with the Department that res judicata did not bar the court's consideration here of events predating its February 2009 order denying termination.

---

[6] In its brief on appeal, the Department argues the father and mother did not sufficiently plead res judicata. We do not address that argument.

Family Code § 161.004, entitled "Termination of Parental Rights After Denial of Prior Petition to Terminate," provides:

> (a) The court may terminate the parent-child relationship after rendition of an order that previously denied termination of the parent-child relationship if:
>
> > (1) the petition under this section is filed after the date the order denying termination was rendered;
> >
> > (2) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered;
> >
> > (3) the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and
> >
> > (4) termination is in the best interest of the child.
>
> (b) At a hearing under this section, the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child.

Tex. Fam. Code Ann. § 161.004 (West 2008).

Order of pleadings, § 161.004(a)(1)

Whether the order signed on February 9, 2009, was rendered on December 12, 2008, or February 9, matters not since the Department's petition seeking termination was filed December 31, 2009.

Material and substantial change of circumstances, § 161.004(a)(2)

There are no definite guidelines as to what constitutes a material and substantial change in circumstances under § 161.004. *In the Interest of B.L.H.,* 01-06-0817-CV, 2008 Tex. App. Lexis 2212, at *16 (Tex.App.--Houston [1st Dist.] Mar. 27, 2008, no pet.) (mem. op.) (citing *Wright v. Wright,* 610 S.W.2d 553, 555 (Tex.Civ.App.--Houston [1st

21

Dist.] 1980, no writ)).   Rather the determination is made by the facts of each case. *Wright,* 610 S.W.2d at 555.

At the December 12, 2008 hearing, the parties agreed the Department should be appointed the permanent managing conservator of N.R.T., and the Department was so appointed by the February 2009 order.  That same order denied all other relief sought, including termination.  The parties further agreed, however, to a home study of J.G., as a potential temporary placement for N.R.T.  After the February 2009 order, the home study was completed but the home of J.G. was rejected as a placement for N.R.T.  This left N.R.T. in foster care with K.V. while the father and the mother remained in prison.  Meanwhile, K.V. desired to adopt the child and undertook legal proceedings toward that end.

We conclude these facts, which are undisputed, evince a material and substantial change of circumstances of the child, the Department and the foster mother after the rendition of the order denying termination. If for no other reason, the failure of J.G.'s home study worked a substantial change in the analysis of the best interest of the child.  Without a feasible family member placement, termination became significantly more likely.  And the failure of the home study and the further passage of time undoubtedly encouraged K.V. to seek adoption.

Prior commission of predicate act, § 161.004(a)(3)

Subsection (3) requires proof the parent committed an act listed under § 161.001 before the date the order denying termination was rendered.  Among the grounds for termination alleged by the Department in December 2009 was that the father and the

mother had engaged in criminal conduct resulting in conviction and confinement and inability to care for N.R.T. for not less than two years from the date of filing of the June 2007 petition. Tex. Fam. Code Ann. § 161.001(a)(Q) (West Supp. 2010). The record establishes both parents' conviction and confinement for a period of more than two years after the 2007 petition's filing. The court could have found the evidence we have discussed, specifically including the evidence of the proposed but disapproved family placements, demonstrated the parents' inability to care for the child during their incarceration. The record thus supports a finding that both parents committed an act listed under § 161.001 before the date the order denying termination was rendered, satisfying the requirement of § 161.004(a)(3).

As discussed, we have concluded the evidence was legally and factually sufficient to support the trial court's findings that termination of the parent-child relationships between both parents and N.R.T. was in the child's best interest.

Under § 161.004(b) the trial court was free to consider evidence predating December 2008. Moreover, we conclude, its implied findings supporting termination under § 161.004(a) are supported by sufficient evidence.

Conclusion

Having overruled each of the issues of the father and the mother necessary to our disposition of the case, we affirm the order of the trial court.

James T. Campbell
Justice

23