**Opinion issued March 5, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00935-CV

————————————

## IN RE G.C., A CHILD

———————————————————————————————

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-05981J**

———————————————————————————————

## MEMORANDUM OPINION

Appellant, E.O.R., appeals the trial court's termination of his parental rights

to his child, G.C.[1]  In four issues, E.O.R. argues that the evidence was legally and

factually insufficient: (1) to support termination of his parental rights pursuant to

---

[1]     The trial court also terminated the parental rights of G.C.'s mother and the parental rights of the father of G.C.'s two older siblings.  Neither the mother nor the father of the two older children is a party to this appeal.

Family Code section 161.001(1)(N); (2) to support termination of his parental rights pursuant to section 161.001(1)(Q); (3) to support the trial court's finding that termination of his parental rights was in G.C.'s best interest; and (4) to support the appointment of the Department of Family and Protective Services ("DFPS") as G.C.'s sole managing conservator.

We affirm.

## Background

G.C. was born on August 4, 2009, and came into the care of DFPS when she was fifteen days old because of allegations that her mother physically abused her, causing a cut to her lip that required stitches and bruising to her thighs and legs.[2] DFPS removed G.C. and her two older siblings, W.R. and A.R., from their mother and filed an original petition for termination of the mother's parental rights to all three children and the parental rights of the presumed fathers. The mother subsequently pleaded guilty to injury of a child, was convicted, and was incarcerated.

DFPS learned through court-ordered genetic testing that the man listed on G.C.'s birth certificate was not her biological father. DFPS subsequently amended

---

[2]    The DFPS case worker testified that G.C.'s legs were bruised. G.C.'s foster mother testified that her legs were fractured. No medical records were introduced. A social worker involved with the family at the time G.C. was removed from her mother filed a report which stated that the injury to G.C.'s lip required surgery with general anesthesia to repair.

its petition to name E.O.R. as G.C.'s alleged father and served him on March 5, 2010. The trial court ordered further genetic testing of E.O.R., who is serving a twelve-year sentence for aggravated robbery. At a status hearing on June 14, 2010, DFPS caseworker Dawn Miles testified that DFPS had just received the results of the DNA test establishing that E.O.R. was the father of G.C. Miles also testified that, at that time, E.O.R. did not have an attorney appointed to him, but he had written DFPS to ask that his mother ("the grandmother") be considered as a placement for G.C. Miles stated that DFPS had conducted a preliminary home study of the grandmother's home and that it intended to perform a full home study. Miles testified that the grandmother was interested in taking all three children. The trial court appointed an attorney for E.O.R. at this hearing and ruled that the children remain in foster care while DFPS completed its home study.

On February 14, 2011, the trial court conducted a status hearing. DFPS's attorney stated that the mother's attorney intended to discuss relinquishment with her and that E.O.R. did not want to have a full trial. In light of this information, the trial court ordered the parties to attend mediation.

Trial commenced on September 21, 2011. DFPS informed the trial court that G.C.'s mother had relinquished her parental rights to G.C. and the other two children. E.O.R. appeared and testified. He acknowledged that he had not had any contact directly with G.C., as he was imprisoned at the time she was born and was

still incarcerated at the time of trial. He also testified that he had not written her any letters; however, he testified that he had contacted DFPS on more than one occasion to seek information about G.C. and to express his desire to retain his parental rights and to have G.C. cared for by the grandmother while he is incarcerated. E.O.R. stated that the grandmother was a legal resident, but she did not have any plans regarding what she would do when her work permit expired. E.O.R. also testified that he did not believe that G.C. was injured by her mother, because he had observed the mother with her other two children and thought she was a good mother. E.O.R. believed it was the man who had been living with the mother—the man originally listed as G.C.'s father on her birth certificate—who had injured G.C., but he had not discussed his belief or the incident regarding injury to G.C. with the mother. He acknowledged that he maintained correspondence with G.C.'s mother, but they did not discuss the details of G.C.'s injury.

Miles testified that she had had "limited contact [with E.O.R.] via letters." She testified that she wrote him three letters and he responded three times. The first letter from E.O.R. "asked about DNA." She then sent a letter letting him know that the DNA test established that he was G.C.'s father, and he requested a home study of the grandmother's home. E.O.R. also requested a photo of G.C. Miles was not aware of any other attempts by E.O.R. to have contact with G.C.

Miles testified that a home study was conducted and that the grandmother's home was not approved because of "safety concerns as well as well-being concerns." Miles specified that the grandmother planned to have all three children share a room with her and her husband, and DFPS was concerned that the children would not have enough space. The grandmother already lived in the three-bedroom home with her own two school-age children, her husband, and her adult nephew. DFPS was also concerned because her income "fluctuates," but was usually around $32,000 a year. Miles also stated that DFPS was concerned that the grandmother "would not be protective and that [she] would allow [the children's mother] to have unsupervised contact with the child." Miles attempted to explain the basis of her concern on this topic, but her testimony was objected to on the ground that it was hearsay, and the trial court sustained the objection.

On cross-examination, Miles testified that the person who conducted the home study on the grandmother's home reported that the home was in a good neighborhood and in good condition and that the assessor recommended placement of the three children with the grandmother. Miles stated that it would not be "really, really bad" to place just one child in the grandmother's home, but she did not believe it was in G.C.'s best interest to be separated from her siblings. Miles stated that DFPS believed the children's best interest would be served by placing them for adoption and that the grandmother could not adopt the children because of

5

her immigration status. Miles stated that she understood the grandmother was a legal resident, but Miles had not actually seen a copy of her temporary work visa.

Miles stated that the children had bonded with their foster home and that all of the children's needs were being met by the foster placement. She believed that it was in G.C.'s best interest to remain with her siblings, as they were bonded to each other. Miles testified that DFPS's goal was to place all three children for adoption together.

The trial was subsequently continued because of problems regarding service on the father of the other two children. When the trial reconvened almost one year later, on September 5, 2012, DFPS sought to present new evidence, but its attorney also stated that DFPS was satisfied it had met its burden of proof. The trial court denied DFPS's motion to re-open its case.

E.O.R. presented evidence from the grandmother. The grandmother testified regarding her household's income, indicating that it was generally between $27,000 and $32,000 a year. She testified that she had a temporary work permit that was valid "at least until a year from now." She testified that she had been in this country twenty years and that she had "always done [her] best to keep [her] papers updated." The grandmother testified that she was willing to care for all three children and that the older two children had lived with her for two months

prior to their removal from their mother. She further testified that she would keep the mother from having contact with the children if they were placed with her.

The grandmother testified that she had been requesting visits with the children since 2010 when she became aware of the CPS case. She stated that "[e]very time they have called me I have requested visitation with them" and that she made her request to Miles, the caseworker, but that Miles "hasn't allowed [her] to visit with them." The grandmother testified that she had sought to have the children placed with her from the time that she first learned they were in DFPS custody until the present. She had had no contact with the children in the previous year, but she had asked DFPS to allow her to visit the children and they would not let her. She agreed that it was in G.C.'s best interest to remain with her siblings, but she expressed the desire to care for G.C. even if DFPS would not allow her to have all three children. When asked, "What are you asking from the Court today," she responded, "If it's possible that—if it would be possible to have the children with me. And if it could be possible to visit with them."

E.O.R. again testified that he had not contacted G.C. or written her any letters, but he had contacted DFPS. He testified that his release date is January 10, 2021, if he serves his entire sentence, but he believed that he might be released in as little as two years from the date of the trial. He also testified again that he had no means to provide for G.C. except through the grandmother.

7

The children's foster mother testified that the children had been in her home for a little over three years, that they were very close to each other, and that it was in their best interest to stay together. She had been caring for G.C. since she was fifteen days old. She testified that she and her husband were willing to adopt the children. The foster mother also testified that she would have no objection to allowing the grandmother to visit the children while they were in her care.

The trial court entered a decree terminating the mother's parental rights to all three children based on her affidavit of relinquishment. It also terminated the parental rights of the father of G.C.'s two older siblings. Finally, the trial court terminated E.O.R.'s parental rights to G.C., finding that he had violated subsections 161.001(1)(N) and 161.001(1)(Q) and that termination was in G.C.'s best interest.

## Termination of E.O.R.'s Rights to G.C.

In his first three issues, E.O.R. argues that the evidence supporting the trial court's termination of his parental rights to G.C. was legally and factually insufficient.

### A. Standard of Review

In a case to terminate parental rights brought by DFPS under Family Code section 161.001, DFPS must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying

termination and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. §161.001 (Vernon Supp. 2012); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2008); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002); *see also Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (holding that, because termination of parental rights "is complete, final, irrevocable and divests for all time [the natural right of a parent], the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights") (citing *Santosky v. Kramer,* 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

In conducting a legal-sufficiency review in a parental-rights-termination case under section 161.001, we view all the evidence in the light most favorable to the finding to determine whether the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d at 266. We "must consider all of the evidence, not just that which favors the verdict." *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266. We "must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so," and we "should disregard all evidence that a

9

reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266.

"[T]ermination findings must be upheld against a factual sufficiency challenge if the evidence is such that a reasonable jury could form a firm belief or conviction that grounds exist for termination under Texas Family Code sections 161.001 and 161.206(a)." *In re C.H.*, 89 S.W.3d at 18–19. To reverse a case on insufficiency grounds, "the reviewing court must detail the evidence relevant to the issue of parental termination and clearly state why the evidence is insufficient to support a termination finding by clear and convincing evidence." *Id.* at 19. In *In re C.H.*, the supreme court emphasized that, in applying the "clear and convincing" evidence standard, the appellate courts "must maintain the respective constitutional roles of juries and appellate courts." *Id.* at 26. In that regard,

> [a]n appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt. . . . While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.

*Id.* (internal citation omitted).

DFPS must establish both elements—that the parent committed one of the acts or omissions enumerated in section 161.001(1) and that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. §161.001; *In re C.H.*, 89

10

S.W.3d at 23. Termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). However, "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Thus, if multiple predicate grounds are found by the trial court, we will affirm on any one ground because only one is necessary for termination of parental rights. *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.); *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.).

**B.    Termination under Subsection 161.001(1)(Q)**

In his second issue, E.O.R. argues that the evidence was legally and factually insufficient to support termination of his parental rights to G.C. under subsection 161.001(1)(Q).

That subsection provides that a parent's rights may be terminated when the parent "knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition." TEX. FAM. CODE ANN. § 161.001(1)(Q). Thus, "if the parent is convicted and sentenced to serve at least two years and will be unable to provide for his or her child during that time, [DFPS] may use subsection Q to ensure that the child will

11

not be neglected." *In re A.V.*, 113 S.W.3d at 360. However, proof that the parent is unable to care for the child is an additional requirement that is not met by showing incarceration alone. *In re B.M.R.*, 84 S.W.3d 814, 818 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *see also In re H.R.M.*, 209 S.W.3d 105, 110 (Tex. 2006) ("Terminating parental rights under subsection Q requires that the parent be both incarcerated or confined *and* unable to care for the child for at least two years from the date the termination petition is filed.") (emphasis in original). Because the parent is incarcerated and unable to care for the child directly, the "care" contemplated by subsection Q "encompass[es] arranging for care to be provided by another." *In re Caballero*, 53 S.W.3d 391, 396 (Tex. App.—Amarillo 2001, pet. denied).

Once DFPS has established the parent's knowing criminal conduct resulting in his incarceration for more than two years, the burden shifts to the parent to produce some evidence as to how he will arrange care for the child during that period. *Hampton v. Tex. Dep't of Protective & Regulatory Servs.*, 138 S.W.3d 564, 567 (Tex. App.—El Paso 2004, no pet.); *In re E.S.S.*, 131 S.W.3d 632, 639 (Tex. App.—Fort Worth 2004, no pet.); *In re Caballero*, 53 S.W.3d at 396. When deciding whether an incarcerated parent is unable to care for a child, we may consider factors such as the availability of financial and emotional support from the incarcerated parent. *In re B.M.R.*, 84 S.W.3d at 818. When the parent meets

12

his burden of production, DFPS then has the burden of persuasion that the parent's arrangement would not satisfy the parent's duty to the child. *In re E.S.S.*, 131 S.W.3d at 639–40; *In re Caballero*, 53 S.W.3d at 396.

E.O.R. does not challenge DFPS's evidence that he knowingly engaged in criminal conduct resulting in his incarceration for at least two years from the date of the filing of the petition. He argues instead that the evidence was insufficient to show that he was unable to care for G.C. Specifically, E.O.R. argues that the evidence "conclusively established that [he] could provide a safe environment for [G.C.] through the paternal grandmother."

However, E.O.R. overstates the record, which does not conclusively establish that the grandmother was an acceptable placement for G.C. Under the Family Code, DFPS must investigate a proposed placement to determine if it is in the child's best interest. TEX. FAM. CODE ANN. § 264.754 (Vernon 2008) ("Before placing a child with a proposed relative or other designated caregiver, the department must conduct an investigation to determine whether the proposed placement is in the child's best interest."); *see also id.* § 153.002 (Vernon 2008) (providing that public policy of Texas is that best interest of child is primary consideration in determining conservatorship issues). Miles, the DFPS caseworker, testified in September 2011 that DFPS conducted the required home study and that the grandmother was rejected as an acceptable placement. In spite

of the fact that E.O.R. knew at that time that the grandmother had been rejected as a potential placement, E.O.R. failed to name any other relatives or friends who would care for G.C. on his behalf by the time the trial was recommenced in September 2012.

Thus, viewing the evidence in the light most favorable to the verdict, the evidence supported the trial court's finding that E.O.R. was unable to care for G.C. while he was incarcerated. *See* TEX. FAM. CODE ANN. § 264.754; *In re J.D.S.*, No. 01-10-00767-CV, 2011 WL 4398554, at *4 (Tex. App.—Houston [1st Dist.] Sept. 22, 2011, no pet.) (mem. op.) (holding that evidence was sufficient to support trial court's implied finding that appellant's mother was not suitable or legally viable proposed placement when Missouri agency refused to certify that placement there was in child's best interests under Interstate Compact for Placement of Children).

E.O.R.'s argument that DFPS wrongly denied the grandmother's home study is misplaced. First, even an approved home study would not have been binding on the trial court. *Cf. Kelly v. Tex. Dept. of Fam. & Protective Servs.*, No. 03-11-00670-CV, 2012 WL 5476840, at *4 (Tex. App.—Austin Nov. 9, 2012, no pet.) (mem. op.) (stating, in context of grandparent's efforts to intervene and seek custody of grandchild, "While the home study's recommendation may have improved [grandparent's] chance to change the children's conservator, it was not binding, and the Department and [the Court Appointed Special Advocate] both

rejected the report's recommendation."); *see also* TEX. FAM. CODE ANN. § 264.754 (requiring DFPS to "conduct an investigation to determine whether the proposed placement is in the child's best interest").

E.O.R. correctly argues that the grandmother testified at trial that she was willing and able to care for G.C. and her two siblings, and she provided evidence of her yearly income and other resources. The DFPS caseworker also acknowledged that the grandmother was a good parent to her own two minor children and lived in a good home in a good neighborhood. However, viewed in its context within the entire record, this evidence is not so persuasive as to render DFPS's evidence of E.O.R.'s inability to care for G.C. factually insufficient.

E.O.R. admitted at trial that he had no means of caring for G.C. except through the grandmother. E.O.R.'s contact with G.C. was limited to three letters sent to DFPS, the contents of which addressed the DNA test establishing his paternity, expressed his desire for a home study of the grandmother's home, and sought a picture of G.C. Although E.O.R. learned in September 2011 that DFPS had denied the grandmother's home study, as of the time of trial in September 2012, he had not provided any alternative plans for providing for G.C. or proposed any other family members who could aid him in caring for G.C. during his incarceration.

The grandmother testified that she had never seen nor had any contact with G.C. since the child was in the hospital in 2009. The grandmother also testified that she would agree to keep the children away from their mother, but she also stated that she did not believe that the mother had intentionally hurt G.C., in spite of the fact that the mother had pleaded guilty to injuring G.C., was serving a prison sentence for that crime, and had voluntarily relinquished her rights to G.C. and her other children.

Miles testified that, although it would not be "really, really bad" to place G.C. in the grandmother's home, DFPS had multiple concerns about the placement and did not believe it was in G.C.'s best interest. Miles testified that DFPS was concerned about the strain caring for any additional children would create on the grandmother's family resources, and it was concerned that the grandmother would not be properly protective of G.C. The trial court, as the finder of fact, was entitled to credit this testimony of Miles and to discredit the grandmother's own testimony that she would keep G.C. away from the mother. *See Bush v. Bush*, 336 S.W.3d 722, 730 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (holding that, in bench trial, it was task of trial court alone to assess credibility and demeanor of those testifying before it). It was also entitled to rely upon its own evaluation of the testimony and other evidence in deciding whether E.O.R. was able to provide the financial and emotional support that G.C. needed and the extent to which the

16

grandmother would be able to aid E.O.R. in meeting those financial and emotional obligations. *See In re E.S.S.*, 131 S.W.3d at 639–40; *In re B.M.R.*, 84 S.W.3d at 818; *In re Caballero*, 53 S.W.3d at 396.

In light of the entire record, and giving deference to the proper role of the fact finder, we conclude that the evidence regarding the grandmother's ability to provide financial and emotional support was not so significant as to preclude the trial court from reasonably forming a firm conviction that the father, individually or through family surrogates, was unable to care for G.C. during his incarceration. *See In re H.R.M.*, 209 S.W.3d at 108 (providing standard for factual sufficiency review); *see also In re N.R.T.*, 338 S.W.3d 667, 676 (Tex. App.—Amarillo 2011, no pet.) (holding that testimony of appellant's relative that she was willing and able to care for child during father's imprisonment was not so persuasive as to render DFPS's evidence of father's inability to care for child factually insufficient); *Hampton*, 138 S.W.3d at 567–68 (holding that incarcerated parent did not show ability to care for child when two proposed relative placements were denied under Interstate Compact for Placement of Children); *In re L.O.*, No. 12-12-00196-CV, 2012 WL 5878241, at *7 (Tex. App.—Tyler Nov. 21, 2012, pet. filed) (mem. op.) ("A reasonable fact finder could have concluded . . . that, based on an unfavorable home study, the children would not be placed with M.O.'s parents and

that he made no suitable arrangements to provide care for his children other than foster care.").

Because we affirm the judgment of the trial court under subsection 161.001(1)(Q), we do not address E.O.R.'s first issue challenging the trial court's finding under section 161.001(1)(N).

## C.    Best Interest of G.C.

In his third issue, E.O.R. argues that the evidence was insufficient to support the trial court's finding that termination of his parental rights was in G.C.'s best interest.

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2008). Among others, the following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; and whether an adequate social support system consisting of an

18

extended family and friends is available to the child. *Id.* § 263.307(b); *see In re R.R.*, 209 S.W.3d at 116.

The Texas Supreme Court has set out some additional factors that courts can consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist the individual to promote the best interest of the child; (6) the plans for the child by the individual or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest, especially when there is undisputed evidence that the parental relationship endangered the child. *In re C.H.*, 89 S.W.3d at 27.

The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *Id.* at 28; *In re N.R.T.*, 338 S.W.3d at 677. Furthermore, the best-interest analysis may consider circumstantial evidence,

19

subjective factors, and the totality of the evidence as well as the direct evidence. *In re N.R.T.*, 338 S.W.3d at 677.

Here, G.C.'s age, her present and future emotional and physical needs, and E.O.R.'s ability to parent her and provide for those needs all support termination. At the time of trial in September 2012, G.C. was a normal, healthy three-year-old child. E.O.R. testified that he was unable to provide anything for G.C. at that time because he was incarcerated, and he would remain in prison for at least the next two years, and possibly until 2021, when G.C. would be approximately twelve years old. As of September 2012, E.O.R. testified that he had had no contact with G.C. and had not sent her any letters, pictures, or other gifts or support. His total involvement with her had been three letters sent to DFPS: one seeking information about DNA testing to establish his paternity, one asking that a home study be completed on the grandmother's home, and one asking for a picture of G.C. He also testified that he thought G.C.'s mother was a good mother, in spite of the fact that she had pleaded guilty to injuring G.C. and had relinquished her parental rights.

We also consider the frequency and nature of G.C.'s out-of-home placement. G.C. was placed in foster care when she was fifteen days old, and she has never lived with or had any contact with E.O.R. or any member of his family. DFPS plans for G.C. to be adopted by the foster family that she and her siblings have

20

lived with since she was placed in foster care. The evidence reflected that this was a stable placement and that G.C. had bonded with her siblings and her caregivers. E.O.R. did not express any kind of plan for how he intended to care for G.C. upon his release from prison. Regarding why he thought it was in G.C.'s best interest for him to maintain his parental rights, he testified only that his family was her family too. However, the foster mother testified that G.C. was bonded with her siblings and that the foster family desired to adopt all three children and would be willing to allow visitation with the grandmother.

Thus, considering all of the evidence, we conclude that the evidence was legally sufficient to support the trial court's finding that termination was in G.C.'s best interest. *See* TEX. FAM. CODE ANN. § 263.307(b); *In re J.F.C.*, 96 S.W.3d at 264–66. We further conclude that the evidence is factually sufficient because the evidence is such that a reasonable fact finder could form a firm belief or conviction that termination of E.O.R.'s parental rights was in G.C.'s best interest. *See In re C.H.*, 89 S.W.3d at 18–19, 27.

We overrule E.O.R.'s third issue.

### Appointment of DFPS as Sole Managing Conservator

In his fourth issue, E.O.R. argues that the evidence was legally and factually insufficient to support the trial court's appointment of DFPS as G.C.'s sole managing conservator.

There is a rebuttable presumption that it is in a child's best interest for her parents to be named her joint managing conservators. TEX. FAM. CODE ANN. § 153.131(b) (Vernon 2008). In order to rebut this presumption and appoint someone other than a parent as sole managing conservator of the child, a court must find that appointment of a parent would "significantly impair the child's physical health or emotional well-being." *Id.* § 153.131(a); *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Additionally, "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship[.]" TEX. FAM. CODE ANN. § 153.002. Unlike the standard of proof for termination of parental rights, the findings necessary to appoint a non-parent as sole managing conservator need only be established by a preponderance of the evidence. *Id.* § 105.005 (Vernon 2008); *In re J.A.J.*, 243 S.W.3d at 616.

Likewise, the standard of review for the appointment of a non-parent as sole managing conservator is less stringent than the standard of review for termination of parental rights. *In re J.A.J.*, 243 S.W.3d at 616. We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion only. *Id.* (citing *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982)). Therefore, we will reverse the trial court's appointment of a non-parent as sole managing conservator only if we determine that it is arbitrary or unreasonable. *Id.*

We have already concluded that the evidence was sufficient to support termination of E.O.R.'s parental rights under the higher clear-and-convincing burden. Thus, we conclude that the trial court did not abuse its discretion in appointing a non-parent, DFPS, as the sole managing conservator of G.C. *See Quiroz v. Dep't of Fam. & Protective Servs.*, No. 01-08-00548-CV, 2009 WL 961935, at *11 (Tex. App.—Houston [1st Dist.] Aug. 9, 2009, no pet.) (mem. op.) (refusing to consider issue challenging sufficiency of evidence supporting DFPS's appointment as sole managing conservator when court had already upheld trial court's termination of parental rights).

We overrule E.O.R.'s fourth issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.