**Opinion issued August 21, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00219-CV

————————————

## IN THE INTEREST OF C.R.M., A.L.T., AND L.N.T., CHILDREN,
## Appellants

On Appeal from the 313th District Court
Harris County, Texas
Trial Court Case No. 2013-01555J

## MEMORANDUM OPINION

Appellant, T.L.M., challenges the trial court's termination of her parental

rights to A.L.T. and L.N. T. [1]  In her sole issue on appeal, T.L.M. argues that the

---

[1]  T.L.M. does not challenge the portion of the trial court's order regarding C.R.M. None of the fathers or the grandparents who intervened are parties to this appeal.

evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest.

We affirm.

## Background

T.L.M. is the mother of C.R.M., born on November 8, 1998, and twins A.L.T. and L.N.T., born on November 28, 2011. T.L.M. is also the mother of B.M., who is an adult.

In 2011, while she was pregnant with A.L.T. and L.N.T., T.L.M.'s healthcare provider reported her to the Department of Family and Protective Services ("DFPS") because her urine screenings were positive for methamphetamine use. When the twins were born in November 2011, they were placed with relatives while T.L.M. completed services based on a family service plan. T.L.M. completed her services, including in-patient drug treatment, and her children were returned to her in January 2013.

On March 3, 2013, DFPS received a report alleging that T.L.M. failed to properly supervise A.L.T. and allowed him to ingest methamphetamine. According to the report, someone brought A.L.T., who was showing "physical signs of drug ingestion," to the hospital, and the toxicology report revealed that he had both amphetamine and methamphetamine in his system. T.L.M. admitted that A.L.T. had access to illegal drugs, but she did not know how A.L.T. had ingested

2

them. The report also stated that T.L.M. "has past CPS history involving her children and the use of methamphetamines."

T.L.M. submitted to a drug test on March 5, 2013, and she tested positive for the use of methamphetamine.

DFPS filed its original petition for protection of C.R.M., A.L.T., and L.N.T. on March 8, 2013. C.R.M. was placed with her paternal aunt, while the twins were placed with a foster family. DFPS placed T.L.M. on a family service plan. A.A. and M.A., the children's maternal grandparents, intervened in the suit, seeking to be named managing conservators of A.L.T. and L.N.T. and asking that the trial court name T.L.M. and the alleged fathers as possessory conservators with restricted access to the children.

On April 25, 2013, T.L.M. again tested positive for the use of methamphetamine.

In June 2013, T.L.M. was indicted for the offense of serious bodily injury to A.L.T. for allowing him access to amphetamines and methamphetamines. She pleaded guilty to this offense, and on July 9, 2013, the criminal court entered an order deferring adjudication of guilt. As a condition of her community supervision, T.L.M. was required to submit to a drug assessment, and she agreed to participate in an in-patient drug treatment program. She entered the in-patient treatment program in the summer of 2013.

In the fall of 2013, the twins were placed for short periods with various family members, including a two-week placement with their maternal grandparents and a ten-day placement with the same paternal aunt with whom C.R.M. was placed. DFPS did not consider either of the two family placements for the twins successful, and they were returned to their foster family.

The permanency plan and progress report to the court filed January 13, 2014, while T.L.M. was still in her treatment program, stated in part that the maternal grandparents' home study was not approved. The summary provided in the progress report stated:

> The grandparents seem easily manipulated by the mother's emotions and there is a concern that they will allow her access to the children at the mother's coercion. The grandparents and maternal aunt . . . were set up as a potential child safety placement. The children were to stay at the home of the grandparents. It was later discovered that the children were with the aunt a great deal of the time at her apartment. The aunt is reported to be a prescription drug abuser who sells and delivers to her customers at night. She would allegedly leave the children at home for two hours at a time while she went to deliver and sell drugs at night. The aunt was also witnessed taking a large amount of pills and caring for the babies under the influence. This information was not known to CPS at the time of the placement. It is a concern that the grandparents were not protecting the children at risk of future neglect. The ad litem went to the home and found it to be cluttered and unsafe. There were many pill bottles in the home and she did not find the environment conducive for caring for toddler children. She ultimately said that she would not be approving this home as a placement option for the children.

T.L.M. completed her in-patient treatment program and was released on February 5, 2014. The trial on the merits was held approximately one week later.

At trial, on February 11, 2014, the trial court took judicial notice of its previous orders in the case and of T.L.M.'s family service plan.

T.L.M. testified that her children came into DFPS custody for a second time when, two months after completing her services arising from the 2011 referral for drug use, A.L.T. "supposedly ingested methamphetamines" and had to be treated at the hospital. She testified that A.L.T., who was thirteen months old at that time, started acting sick and she took him to the hospital because she did not know what was wrong with him. A.L.T. was treated for ingesting methamphetamine in the pediatric intensive care unit and was eventually released to DFPS's care. T.L.M. stated that she knew that ingestion of methamphetamine by a child could be fatal. She did not know how A.L.T. got access to the drugs, but she testified that she did not knowingly give it to him or knowingly leave it in a place that was accessible to him. T.L.M. acknowledged that she had pleaded guilty to reckless injury to a child based on that incident and had received deferred adjudication.

T.L.M. testified that the night before A.L.T. ingested the methamphetamine her adult child, B.M., had been watching the children. At that time, the children lived with T.L.M. and T.L.M.'s boyfriend, Darrell Stone. T.L.M. had known Stone for approximately four months, and he had lived with her for two of those months. T.L.M. acknowledged that Stone tested positive for methamphetamine

5

use around this same time and that he used methamphetamine while he was staying in her home.

T.L.M. admitted that she was using methamphetamines at the time her children were removed from her care in March 2013, and she acknowledged her previous involvement with DFPS in 2011 regarding methamphetamine use while she was pregnant with A.L.T. and L.N.T. She stated that she had been abusing methamphetamine since 2009, that she received drug treatment as part of a family service plan from 2011 through 2013, and that she relapsed in March 2013, two months after completing her first treatment program. She further testified that she had successfully completed a second treatment program just one week before trial.

As part of that treatment, T.L.M. completed various trainings on recovery, sober living, and parenting. She also identified healthier ways to cope with stress. She testified that her "triggers" for drug use are stress and being around people who use drugs. T.L.M. planned to stay sober by attending Narcotics Anonymous meetings, meeting with her sponsor, relying on a network of mentors and family members, and working on getting a job. At the time of trial, she was living with a friend, but she planned on moving in with her parents if the children were returned to her custody. She testified that her parents would provide for her and the children until she could get a job. Her long-term plans for A.L.T. and L.N.T. were

6

"[f]or them to grow up and be with their mom, being healthy, being happy, being loved, cared for." She was confident that she could stay off of drugs.

T.L.M. testified that, prior to the children's 2013 removal and her subsequent in-patient drug treatment, she lived in a mobile home that was a suitable home for small children. She had paid her living expenses using food stamps, C.R.M.'s social security disability collected from her father, and child support. T.L.M. also worked occasionally with a landscaping company. She acknowledged that she had used her child support money to buy drugs, but she later stated that she used her income tax money to pay for drugs. She testified that, following the removal of the children and the implementation of her family service plan, she had complied with many of the plan's requirements, such as attending a parenting class, attending court hearings, visiting her children, and completing a substance abuse program. She testified that she had not had an opportunity to obtain employment or housing in the week between her discharge from the treatment facility and the day of the trial. She also testified that she was drug-free at the time of trial in February 2014, and she claimed that she had been drug-free since April 2013.

Tameka Palmer, the DFPS caseworker, testified that T.L.M. had not completed her family service plan at the time of trial. Palmer stated that T.L.M. had not obtained stable housing or employment and had not participated in

individual counseling. Palmer further testified that T.L.M. had struggled to maintain stable housing and employment for several years and that her failure to procure housing and employment was not merely a result of her recent participation in the in-patient treatment program.

Palmer testified that sometime in the fall of 2013 the children were placed with their maternal grandparents for approximately two weeks. Palmer conducted several "pop-up" visits and determined that the placement was not appropriate. She noted that the home lacked central heat, that the children were unkempt and unclean when she came to visit, and that they stayed in their pajamas all day. Palmer noted that their faces, hair, and clothing were not being cleaned, that they had diaper rash, and that they had cat urine in their shoes. Palmer further testified that the maternal grandmother was very sick and did not currently live in the home with the grandfather because she was in a rehabilitation facility. Palmer stated that she understood from the grandfather that if the grandmother was released from rehabilitation she would need a lot of care when she returned home. Palmer also testified that there was a lot of smoke in the grandparents' house and this caused the children respiratory problems. Palmer testified that DFPS attempted a second relative placement by having the twins stay with C.R.M. and her paternal aunt. However, that placement lasted only ten days because the aunt contacted DFPS

and asked the caseworker to come get the children, as the twins were too difficult for the aunt to care for in addition to C.R.M. and her own teenage child.

Palmer testified that following these unsuccessful placements with relatives DFPS returned the twins to the same foster home where they had been placed upon their removal from T.L.M. in March 2013. She stated that the foster parents had cared for A.L.T. and L.N.T. from March 2013 until the time of trial in February 2014, except for the brief times the children spent with their grandparents and their aunt. Palmer stated that A.L.T. and L.N.T. had bonded with their foster parents, who were willing to adopt them. The twins were healthy and developmentally on target. Palmer also testified that the foster home was meeting all of their physical and emotional needs. The twins called their foster parents "mom" and "dad." Palmer testified that she believed placement in the foster home was in the twins' best interest because it was a stable and loving environment where the children were protected and well-cared for.

Palmer testified that she had serious concerns about T.L.M.'s ability to parent the children because after becoming involved with DFPS in 2011 and seeking treatment for her drug use T.L.M. relapsed less than two months after the twins were returned to her in January 2013. Palmer was also concerned that, at the time of trial in February 2014, T.L.M. had been out of treatment for only one week, "[s]o, we can't really, you know, gauge as far as if she's going to be clean or

9

sober. . . ." Palmer acknowledged that T.L.M.'s last positive drug test had taken place in April 2013, approximately ten months before trial, but she did not think that this indicated that T.L.M. was drug-free. T.L.M. had been "in a lock-down facility and not . . . out in the real world where temptation is." Palmer testified that T.L.M. had not been tested for drug use in the ten months prior to the trial. She stated that DFPS requested a random urinalysis just prior to T.L.M.'s entering treatment in the summer of 2013, but T.L.M. did not comply and had been in the treatment program until one week prior to trial.

Palmer also testified that she had concerns about T.L.M.'s ability to parent A.L.T. and L.N.T. because they were only two years old at the time of trial. They were too little to care for themselves or protect themselves and were barely verbal. She testified that she did not believe that a parent under the influence of drugs could make responsible decisions about caring for small children. Palmer believed that toddlers require a lot of care and parents who are sober.

Betsy Sanchez, the child advocate and advocacy coordinator for the children, also testified regarding the home study on the maternal grandparents. She testified that she believed that B.M., who was living with her maternal grandparents, was supposed to be responsible for the twins' daily care. Sanchez testified that B.M., who was twenty-one years old at the time, had limited parenting experience, and Sanchez was concerned that B.M. would not have access

to the support system she would need to be a full-time caregiver to two small children. Sanchez had conducted two surprise visits. On one occasion, Sanchez noticed that B.M. had created a sleeping area for herself and the twins in "the front" of the home because both bedrooms were occupied. Sanchez did not notice any concerns regarding the children's physical appearance at that time. On the second visit, Sanchez noted that the children were still sleeping at 10:00 a.m. and that the house was cold in spite of the use of space heaters. Sanchez did not see that the children were dirty, although she knew that there had been concerns about the children's hygiene. Sanchez had never observed the twins to be unclean or unkempt. She also testified that Child Advocates had a concern about the amount of smoke present in the home. Sanchez stated that it appeared there had been people smoking in the house for years and that it caused respiratory problems for the children.

Sanchez also testified that A.L.T. and L.N.T. had adjusted to their foster home and that it was a good placement for them. She testified that both A.L.T. and L.N.T.'s foster parents and C.R.M.'s caregiver had expressed a willingness to allow the siblings to continue to have a relationship with each other and visit. Sanchez testified that, as a result of her interviews with T.L.M., she determined that T.L.M. had "struggled over the years since her marriage with [C.R.M.'s father]." He was an alcoholic and was occasionally violent, and following the

11

breakup of their marriage T.L.M. struggled with addiction and with procuring stable housing and employment. Sanchez testified that she believed those issues continued to be a problem for T.L.M. at the time of trial. Sanchez also testified that all of the support T.L.M. identified as being in place to help her if the children were returned to her—her adult daughter and her parents—was also available as support in 2013 when she completed her first round of drug treatment, but it did not prevent her from relapsing within two months.

B.M. testified that she believed returning the twins to T.L.M. was in the children's best interest. She stated that she would help her mother care for A.L.T. and L.N.T. and would help support them financially. However, B.M. was unemployed at the time of trial because she had quit her job to help care for the twins. She further testified that she wished to be considered as a placement for the twins if T.L.M.'s rights were terminated because she believed she could care for them. B.M. stated that she did not know how A.L.T. had gotten access to methamphetamine and that she was not aware that her mother had been struggling with addiction at the time A.L.T. ingested the methamphetamine in March 2013. B.M. was aware that her mother had struggled with addiction when B.M. was in her late teens, and she testified that it was a difficult thing to witness.

A.A., the children's maternal grandfather, also testified. He stated that the children had been in his care at one time, and he disagreed with the caseworker's

assessment that they were unclean and smelled of animal urine. He believed the children were safe in his home, and he knew that they were bathed every day. A.A. testified that he would help T.L.M. if she were given custody of her children and that he would support her financially until she could support herself. He testified that he loved his grandchildren and that they loved him.

The record also revealed that Darrell Stone, T.L.M.'s boyfriend who was living in the home with the children at the time A.L.T. ingested methamphetamine, had a criminal history, including several convictions for theft, a conviction for aggravated assault, a conviction for burglary, and multiple convictions for drug possession. Likewise, C.R.M.'s father had multiple convictions for assault and deadly conduct, and the father of A.L.T. and L.N.T. had two convictions, one for driving with a suspended license and one for assault causing a bodily injury.

Regarding C.R.M., who had been residing with her paternal aunt and uncle and doing well in that placement, the trial court named the paternal aunt and uncle as her managing conservators. T.L.M. was named a possessory conservator and ordered to pay child support. Regarding A.L.T. and L.N.T., the trial court found that the termination of T.L.M.'s parental rights to the twins was in their best interest and that T.L.M. had violated Family Code sections 161.001(1)(D), (E),

(L), and (O).[2]  In this appeal, T.L.M. challenges only the sufficiency of the evidence supporting the trial court's finding that the termination of her parental rights to A.L.T. and L.N.T. was in the children's best interest.

**Sufficiency of Best Interest Finding**

In her sole issue on appeal, T.L.M. argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights to A.L.T. and L.N.T. was in the children's best interest.

**A.    Standard of Review**

In a case to terminate parental rights brought by DFPS under section 161.001, DFPS must establish, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child.  TEX. FAM. CODE ANN. § 161.001 (Vernon 2014); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of

---

[2]    *See* TEX. FAM. CODE ANN. § 161.001(1)(D) (Vernon 2014) (allowing termination of parental rights when in children's best interest and parent knowingly placed or knowingly allowed children to remain in conditions or surroundings that endangered their physical or emotional well-being); *id.* § 161.001(1)(E) (allowing termination of parental rights when parent engaged in conduct or knowingly placed children with persons who engaged in conduct endangering physical or emotional well-being of children); *id.* § 161.001(1)(L) (allowing termination of parental rights when parent was convicted or placed on community supervision for being criminally responsible for death or serious bodily injury of child for enumerated offenses under Penal Code); *id.* § 161.001(1)(O) (allowing termination of parental rights when parent fails to complete family service plan).

the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

In conducting a legal-sufficiency review in a parental-rights-termination case brought by DFPS under Family Code section 161.001, we must look at all the evidence to determine whether the evidence, viewed in the light most favorable to the finding, is such that a reasonable factfinder could have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *See In re J.O.A.*, 283 S.W.3d at 344–45 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* at 344; *Jordan v. Dossey*, 325 S.W.3d 700, 712–13 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

In conducting a factual-sufficiency review, we view all of the evidence, including disputed or conflicting evidence. *See In re J.O.A.*, 283 S.W.3d at 345. We should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The evidence is factually insufficient only if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

15

reasonably have formed a firm belief or conviction" regarding the finding under review. *In re J.O.A.*, 283 S.W.3d at 345 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

DFPS must establish both elements—that the parent committed one of the acts or omissions enumerated in section 161.001(1) and that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001; *In re C.H.*, 89 S.W.3d at 23. Termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). However, "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Here, T.L.M. does not challenge the trial court's findings under subsections 161.001(1)(D), (E), (L), or (O); rather, she challenges the sufficiency of the evidence supporting the trial court's finding under section 161.001(2) that termination of her rights was in the children's best interest.

## B. Best Interest of the Children

There is a strong presumption that the best interest of the children will be served by preserving the parent-child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2014). The Family Code and the Texas

16

Supreme Court have both set out numerous factors to be considered in determining a child's best interest, including, among others: the child's age and physical and mental vulnerabilities; the child's desires; the magnitude, frequency, and circumstances of harm to the child, including current and future danger to the child; whether there is a history of substance abuse by the child's family; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with minimally adequate health and nutritional care, guidance and supervision, and a safe physical home environment; the stability of the home or proposed placement; and the parent's acts or omissions indicating an improper parent-child relationship and any excuses for the acts or omissions. *See id.* § 263.307(b); *In re R.R.*, 209 S.W.3d at 116; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest. *In re C.H.*, 89 S.W.3d at 27. The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *Id.* at 28; *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). Furthermore, the best

17

interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *See In re N.R.T.*, 338 S.W.3d at 677.

Here, multiple factors support the trial court's finding that termination was in the children's best interest. A.L.T. and L.N.T. were two years old at the time of trial. Palmer, the DFPS case worker, testified that they were too little to care for themselves or to protect themselves, and they were barely verbal. Furthermore, according to the evidence presented at trial, A.L.T. and L.N.T. lived with T.L.M. only from January 2013, when she completed drug treatment required from her 2011 referral to DFPS, until March 2013, when A.L.T. was taken to the hospital for treatment for ingesting methamphetamine. Thus, the children's ages and physical and mental vulnerabilities weigh in favor of terminating T.L.M.'s parental rights. *See* TEX. FAM. CODE ANN. § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

Furthermore, there was evidence that T.L.M. also engaged in conduct that endangered A.L.T. and L.N.T. T.L.M. continued to abuse drugs even after her children were removed for the first time, and she failed to complete her family service plan, including the requirement that she complete individual counseling, and that she obtain stable employment and housing. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (holding that findings under section 161.001(1)(O) that parent failed to complete court-ordered services can support best interest finding);

18

*In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) ("A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children.").

T.L.M. tested positive for drug use in March 2013 and again in April 2013. She did not comply with the requested random urinalysis immediately prior to her entry into in-patient drug treatment, and she had been out of treatment for one week at the time of trial. DFPS also presented evidence that T.L.M.'s children had been removed from her care on a previous occasion because of her drug abuse, that she had completed a rehabilitation program, but that she had relapsed within a few months of having the children returned to her. The evidence also indicated that Darrell Stone, who lived with T.L.M. at the time A.L.T. ingested methamphetamine, also tested positive for drug use and that T.L.M knew that he used drugs while he lived with her. Other men involved in T.L.M.'s and the children's lives, including C.R.M.'s father and the twins' father, had a history of substance abuse and criminal activity. Thus, the record contains evidence regarding circumstances that resulted in harm to A.L.T. and a lack of physical safety for the children. It also revealed the extent of T.L.M.'s history of drug abuse, her unwillingness to complete court-ordered services, and her lack of

parenting skills. *See* TEX. FAM. CODE ANN. § 263.307(b) (providing that, in determining best interest of child, courts should consider circumstances of harm, history of substance abuse, willingness to complete services, demonstration of parenting skills, and safety of physical home environment); *Holley*, 544 S.W.2d at 371–72 (providing that, in determining best interest of child, courts should examine stability of home and proposed placement and parent's acts or omissions indicating improper relationship).

Regarding the children's placement at the time of trial, Palmer testified that the foster family was interested in adopting A.L.T. and L.N.T. and that the foster parents and C.R.M.'s guardian were willing to cooperate in allowing the siblings to maintain a relationship. Palmer indicated that the foster parents were meeting all of the twins' needs and that the twins had bonded with them and called them "mom" and "dad." The twins had lived with the foster parents from March 2013 until the time of trial in February 2014 except for brief periods, totaling less than one month, when they lived with various family members. Thus, the stability of the proposed placement also weighs in favor of terminating T.L.M.'s parental rights. *See* TEX. FAM. CODE ANN. § 263.307(b) (providing courts should consider stability of proposed placement in determining best interest).

20

We conclude that the evidence was legally sufficient to support the trial court's finding that termination of T.L.M.'s parental rights to A.L.T. and L.N.T. was in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 344.

T.L.M. argues that the trial court erred by not placing A.L.T. and L.N.T. with their maternal grandparents or other relatives. Specifically, she argues that "[t]he record as a whole is thin as to the reasons why the maternal relatives were not considered for placement." T.L.M. argues that the maternal grandmother's health may have prevented her from serving as the children's conservator, but the maternal grandfather, assisted by T.L.M.'s adult child B.M., "could have been considered for conservatorship, as the conditions at the maternal home do not appear irreversible based on the testimony of the caseworker." T.L.M. emphasized Sanchez's testimony that she did not note any concerns regarding the children's physical appearance as they did not appear dirty and she never observed them to be unclean or unkempt.

However, Palmer testified about the children's two-week placement with their maternal grandparents. She testified that the home lacked central heat, that the children were unkempt and unclean when she came to visit, and that they stayed in their pajamas all day. Palmer noted that their faces, hair, and clothing were not being cleaned, that they had diaper rash, and that they had cat urine in their shoes. Palmer further testified that the maternal grandmother was very sick

21

and did not currently live in the home with the grandfather because she was in a rehabilitation facility and that, if she returned home, she would need a lot of care. Palmer and Sanchez both testified that they were concerned about the children's exposure to cigarette smoke and the resulting respiratory problems. Additionally, Palmer and Sanchez both expressed concern about B.M.'s ability to contribute to A.L.T.'s and L.N.T.'s care. Sanchez testified that B.M. was young, did not have significant parenting experience, and did not have access to the support she would need to provide care for two small children. B.M. testified that she wanted to help her mother provide for the twins, but she acknowledged that she was unemployed at the time of trial.

T.L.M. "suggests that the desires of the children would be to be with their maternal relatives." However, there is no evidence in the record that A.L.T. and L.N.T. actually expressed any opinions regarding who should be their primary caregiver. Even if they had, the children were two years old at the time of trial, so the consideration of their desires does not carry the same weight as would the desires of older children. *See In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("The young age of the child rendered consideration of the child's desires neutral."). Furthermore, Palmer testified that the children were happy in their foster home and that they appeared bonded to their foster parents, who had cared for them for longer than their mother had.

Finally, T.L.M. points out that she completed some of her services. She argues that this "is compelling evidence that it is not in the twins' best interest to have their mother's parental rights terminated." However, the evidence demonstrated that T.L.M. had struggled with retaining stable employment and housing for an extended period of time and that she had an on-going struggle with addiction to methamphetamine. Although she completed her drug treatment, the record does not contain any indication that her means of support had materially changed since the last time she completed drug rehabilitation, in 2013. Palmer testified that she had serious concerns that T.L.M. might relapse a second time.

Thus, we conclude that the evidence was both legally and factually sufficient to support the trial court's finding that termination was in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 344–45.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.

23