**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00171-CV**
_____

**IN THE INTEREST OF J.H.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 13-10-11650 CV**

**MEMORANDUM OPINION**

After a bench trial, the trial court modified a prior order affecting the parent-child relationship and entered an order terminating the parental rights of R.H. (Mother or appellant)[1] to her seven-year-old son, J.H. *See* Tex. Fam. Code Ann. § 161.001 (West 2014). In two appellate issues, Mother challenges (1) the legal and factual sufficiency of the evidence supporting the termination of her parental rights

---

[1] We identify the minor children by initials to protect their identities. *See* Tex. R. App. P. 9.8. Other members of the family are identified by either initials or based upon their relationship to the children. After the suit was filed, the Father executed an affidavit voluntarily relinquishing his parental rights to J.H. Father is not a party to this appeal. We reference Father in the opinion only as necessary to place matters in context for our appellate review of Mother's appeal.

1

under section 161.001(1)(O) of the Texas Family Code and (2) the legal and factual sufficiency of the evidence supporting the finding that termination of her parental rights is in J.H.'s best interest. *See id.* § 161.001(1)(O), (2). We hold the evidence is sufficient to support the trial court's order, and we affirm the judgment.

PROCEDURAL BACKGROUND

The 2010 Removal

In 2010, when J.H. was two years old, the Department of Family and Protective Services (the Department) filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in [a] Suit Affecting the Parent-Child Relationship (the petition). In the petition, the Department requested that the trial court appoint the Department as J.H.'s temporary sole managing conservator because there was "a continuing the Department alleged danger to the physical health or safety" of J.H. if he was not removed and that the "continuation of the child in the home would be contrary to the child's welfare[.]" The Department also requested that the trial court appoint the Department as J.H.'s permanent sole managing conservator if J.H. could not be reunified with either parent or permanently placed with a relative or other suitable person for placement, and that Mother's parental rights be terminated if reunification cannot be achieved. The petition alleged that the appointment of either Mother or Father as permanent

2

managing conservator would not be in J.H.'s best interest because it "would significantly impair the child's physical health or emotional development." The petition was supported by an attached sworn and notarized affidavit of a Child Protective Services (CPS) worker, and the affidavit described the circumstances necessitating removal.

According to the affidavit in support of emergency removal, CPS received a report alleging neglectful supervision of one-year-old J.H. in April of 2009, alleging that Mother had left her diaper bag in the lobby while at a clinic, and when the staff looked in the bag to determine the owner, the staff found marijuana and discovered the bag belonged to Mother. The affidavit stated that Mother denied using drugs or having knowledge of how the marijuana got into her diaper bag, and two weeks later Mother tested negative for illicit substances on a drug screen.

The affidavit stated that CPS received another report in May of 2009, alleging that J.H. was examined in an emergency room for a crushed foot, that he had been to the emergency room several times that year, and that while Mother was in the hospital for sickle cell anemia, J.H. would wander the halls unsupervised. A CPS investigator questioned Mother about the injury to J.H.'s foot and Mother stated that a car ran over his foot while Mother and J.H. went to check the mail. According to the affidavit, during an assessment in 2009, Mother stated

3

she has sickle cell anemia and has suffered two strokes, Mother also reported that Mother and her siblings were removed from their mother by CPS due to medical neglect when they were children, and Mother would "not discuss her medical needs and bec[a]me[] defensive if the subject [wa]s brought up."

CPS received another report in August of 2009, alleging Mother physically abused J.H., and that during an argument between Mother and one of her sisters, J.H. was pushed down and hit his head. When the CPS worker arrived at Mother's residence to investigate the complaint, no one was home. The worker called Mother's cell phone and told her that the worker needed to see Mother and J.H. Mother told the worker that the worker was not allowed to show up at her residence without calling first and then Mother "hung up" on the worker. According to the affidavit, as the worker was leaving, Mother got out of a vehicle with J.H. The worker noted that J.H. had a scratch under his right eye and a bright red spot on his right eyeball. Mother told the worker that the scratch was from J.H. fighting with his cousin who was the same age as J.H. Mother also told the CPS worker that the spot in J.H.'s eye was from the same fight or from "Pink Eye." Mother refused to let the worker take photographs of J.H. The worker witnessed Mother cussing at J.H., J.H. walking up stairs unassisted, and J.H. eating "old" food. In August of 2009, one of Mother's sisters, C.J., called the worker and

explained that C.J. had been appointed J.H.'s guardian and keeps J.H. on the weekends, but that C.J. was concerned because "every weekend he comes over with new marks and bruises[.]"C.J. explained that Mother told her that the marks and bruises were from J.H. falling.

According to the affidavit, J.H. was voluntarily placed with one of Mother's sisters, S.H., on September 10, 2009, and Mother completed a substance abuse assessment and began parenting classes. On January 29, 2010, the CPS worker made an unannounced visit to Mother's home and could see Mother standing in the window and J.H. running around the living room. Mother came to the window and told the worker she was not going to open the door, and Mother closed the blinds. The affidavit further alleged the CPS worker called law enforcement, after which J.H. was observed to have a scab on his nose, a scab under his left eye, and a bruise beside his right eye. When asked how J.H. sustained the injuries, Mother responded that J.H. was playing with the blinds at S.H.'s home and the blinds hit him in the face. Mother explained that J.H. was with her because S.H. had to go somewhere and needed Mother to watch J.H. The CPS worker also learned that Mother had failed to get one of J.H.'s prescriptions refilled.

On February 1, 2010, the trial court signed an Order for Protection of a Child in an Emergency and Notice of Hearing, and the order named the

Department as J.H.'s temporary sole managing conservator. On February 8, 2010, and after a full adversary hearing, the trial court signed an order naming the Department as J.H.'s temporary managing conservator, granting Mother and Father supervised visitation with J.H., and ordering Mother and Father to attend counseling and parenting classes, submit to drug and alcohol assessments and testing, and comply with their service plans during the pendency of the suit. J.H. was then placed with his maternal great-grandmother. As a result of an Agreed Final Order signed by the trial court on November 2, 2010, C.J. and R.J., J.H.'s aunt and uncle, were ultimately named the permanent managing conservators of J.H., with Mother having the right to supervised visits with J.H.

The 2013 Removal

On October 29, 2013, after a referral alleging the neglectful supervision of J.H. by the aunt and uncle, sexual abuse of J.H. by an unknown perpetrator, and that C.J. and R.J. had stated they no longer wanted to care for J.H., the Department filed a petition for protection of J.H., for conservatorship, and for termination of Mother's and Father's parental rights (the 2013 Petition). The Department attached to the 2013 Petition a Department representative's signed and notarized affidavit in support of removal of J.H. from C.J.'s and R.J.'s care. The affidavit stated that because C.J. and R.J. "refus[ed] to accept parental responsibility for [J.H.][,]" the

6

Department was requesting to be named J.H.'s temporary managing conservator. The trial court signed an Order for Protection of a Child in an Emergency, which stated that there was a danger to J.H. and appointed the Department as J.H.'s temporary managing conservator for the second time.

On November 6, 2013, after a full adversary hearing, the court signed a temporary order finding that C.J. and R.J. were unwilling and unable to provide J.H. a home, and the court appointed the Department as temporary managing conservator and Mother and Father as temporary possessory conservators with limited rights and duties. The order required, pursuant to section 263.106 of the Texas Family Code, Mother to comply with each requirement of the Department's service plan during the pendency of the suit. Although represented by counsel, the hearing transcript and the order do not reflect that Mother attended the trial.

After hearing evidence at a bench trial in April of 2015, the trial court entered a termination order terminating Father's parental rights as to J.H., finding that such termination is in J.H.'s best interest, and that Father had executed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by Chapter 161. *See* Tex. Fam. Code Ann. § 161.001(1)(K), (2). In the termination order the trial court also terminated Mother's parental rights as to J.H., finding such termination is in J.H.'s best interest, and that Mother failed to comply with

7

the provisions of a court order that specifically established the actions necessary for her to obtain the return of J.H., who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of J.H.'s removal from the parent under Chapter 262 for the abuse or neglect of the child. *See id.* § 161.001(1)(O), (2). Mother appealed.

STANDARD OF REVIEW

In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish at least one ground listed under subdivision (1) of the statute, and must also prove that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Due process requires the petitioner to justify termination by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (West 2014); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "Clear and convincing" evidence is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014).

In a legal sufficiency review of an order terminating parental rights, the evidence relating to a challenged finding is reviewed "in the light most favorable to

8

the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. With respect to Mother's factual sufficiency arguments, we must "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* Under a factual sufficiency standard, the trial court's findings are sufficient unless, based on the entire record, the disputed evidence that could not have been credited in favor of the finding is so significant that the trial court could not have reasonably formed a firm belief or conviction that the challenged finding was true. *See id.*

TESTIMONY AND OTHER EVIDENCE PRESENTED AT TRIAL

The CPS caseworker assigned to the case testified that the Department had been the temporary managing conservator of J.H. since November of 2013. She stated that the Department had custody of J.H. on a prior occasion, that J.H. was initially removed from Mother's care due to neglect, and that J.H.'s relatives were appointed permanent managing conservators. According to the caseworker, Mother has not provided proof of completion of the following tasks required by her service plan: individual counseling, parenting classes, some of the random drug screens, maintenance of stable and appropriate housing, and maintenance and proof of employment. After Mother's drug and alcohol assessment, Mother failed to

9

participate in the recommended outpatient services, individual counseling, and a psychiatric evaluation. According to the caseworker, although Mother claims she has been hospitalized five to seven times for her sickle cell anemia, the caseworker has not seen documentation of the hospitalizations and she believes Mother has been given a fair opportunity to complete all of her services. The caseworker testified that she told Mother that if transportation was an issue, the caseworker could provide transportation to services. The caseworker also testified that all of J.H.'s relatives who had been suggested as possible placements for J.H. were either unable or unwilling to care for J.H..

At the supervised visits that Mother attended, the caseworker observed that sometimes Mother appeared not to be feeling well, Mother would want to sleep during the visits, and would hand J.H. a phone. According to the caseworker, there were several visits that Mother indicated she would attend but then Mother failed to appear, which upset J.H. and caused him to cry and have some behavior issues at school. As a result of Mother's failure to appear at visitations, the visits were suspended by court order in September 2014. The caseworker explained that Mother never brought up visitation with J.H. again or asked that visitation be reinstated. The caseworker testified that despite Mother's inability to be able to provide J.H. with a safe and stable home, the caseworker believes that Mother

10

loves J.H. According to the caseworker, she asked Mother to demonstrate a willingness and an ability to protect J.H. from harm, to accept the responsibility of being a parent, and to put J.H.'s needs ahead of her own. The caseworker testified that Mother has not achieved these goals. The caseworker explained that, although J.H. still wants to see Mother, the caseworker believes that terminating Mother's parental rights to J.H. is in his best interest because J.H. needs stability and a family, and his behavior and demeanor are suffering because he does not have permanency.

The caseworker testified that the Department's goal for J.H. is to get him into an adoptive home as soon as possible. She explained that J.H. is currently in a foster home and, although the foster parents are agreeable to J.H. living there, they are not willing to adopt him.

The court-appointed special advocate (CASA) for J.H. also testified at trial. She stated that terminating Mother's parental rights as to J.H. is in J.H.'s best interest. According to the CASA, "the first couple of visits" between Mother and J.H. were "really nice[,]" but then "the visits bec[a]me very inconsistent" and Mother would "give him her phone so he could play games and then she would go over to the corner, curl up, and go to sleep. Sometimes she would sleep through almost the entire visit." The CASA explained that after Mother did not appear for

four consecutive scheduled visits, J.H. got progressively more upset, and the CASA "grew to be in favor of suspending the visits." The CASA testified that after the visits were suspended, Mother never mentioned it again.

The CASA agreed that, even considering Mother's health issues, Mother was given a sufficient opportunity to complete her services and that the CPS caseworker went "above and beyond" to provide services for Mother. The CASA was present when the caseworker offered to provide Mother transportation to services, and the CASA also provided her phone number to Mother in order to help set up transportation for Mother if necessary, but Mother never called the CASA. The CASA admitted that Mother appeared ill and that her health issues could have impacted Mother's ability to complete services, but Mother never told the CASA that she was unable to participate in services because of her illness.

According to the CASA, although J.H.'s current foster parents have stated several times that they are willing to keep J.H. until he is adopted by another family, the foster parents' inquiries about when J.H. might be leaving have increased as J.H.'s behavioral problems have escalated. The foster parents have four other foster children in their home. The CASA expressed concern that J.H.'s placement might have to be moved in the interim. The CASA also noted that J.H.'s behavioral issues escalated when the other foster children in the foster home had

contact with their parents. The CASA attributed J.H.'s behavioral issues to his awareness that he does not have a permanent home or a permanent person who is dedicated to him. The CASA testified that the Department had recommended that J.H. cease contact with Mother and the CASA supported it, based on the recommendations from J.H.'s therapist. According to the CASA, J.H. knows he cannot live with Mother, and although he has mentioned to the CASA wanting to call his Mother on two or three occasions, he has not asked to see her. The CASA testified that she believed it was in the best interest of J.H. for the trial court to terminate Mother's parental rights to J.H.

At trial, Father's affidavit of voluntary relinquishment of parental rights as to J.H. and an order terminating Mother's parental rights as to another child were also admitted into evidence. The trial court also took judicial notice of pleadings and certain documents in the clerk's file, including the temporary order dated November 6, 2013, and the order consolidating this case with the previous case appointing C.J. and R.J. as permanent managing conservators for J.H.

STATUTORY GROUNDS FOR TERMINATION

In her first issue, Mother argues that there is insufficient evidence to show that J.H. "was removed from the conservator due to abuse or neglect." *See* Tex. Fam. Code Ann. § 161.001(1)(O). Appellant does not contest that she did not

13

complete the family service plan or that J.H. had been removed from her care for more than nine months at the time of the termination hearing. According to appellant, the Department "failed to present evidence as to any abuse and neglect" necessitating the 2013 removal because the relatives that were appointed conservators of J.H. in 2010 "placed [J.H.] in the care of the Department because they could no longer care for him[.]"

Section 161.001(1)(O) of the Texas Family Code provides that a court may terminate the parent-child relationship if the parent:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

*Id.* The parent who fails to comply with a court order as required by subsection (O) need not be the same person whose abuse or neglect triggered the child's removal. *See In re D.R.H.*, 395 S.W.3d 316, 320 (Tex. App.—Fort Worth 2013, no pet.); *In re D.R.A.*, 374 S.W.3d 528, 532 (Tex. App.—Houston [14th Dist.] 2012, no pet.). We interpret the terms "abuse" and "neglect" broadly to include risks or threats presented by the child's environment. *See In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013). Evidence of abuse or neglect submitted in an affidavit attached to a petition for removal, combined with unchallenged trial court findings that removal of the

14

child from the parent's care was necessary because of a "substantial risk of a continuing danger" if the child returned home, provides sufficient evidence to establish that a child was removed from the parent's custody under Chapter 262 for abuse or neglect. *See id.* at 248-49.

Although J.H. was removed from the care of the relatives appointed as managing conservators, J.H. was originally removed from Mother's care pursuant to Chapter 262. The trial court consolidated the cases and took judicial notice of the pleadings in the prior case. In 2009, the Department received reports that Mother was carrying marijuana in her diaper bag and that Mother was neglecting and physically abusing J.H. Mother's sister reported her concern of new bruises and marks on J.H. after he was in Mother's care. The Department received a report that J.H. had been seen in the emergency room several times and that he was not being supervised. J.H.'s original removal from Mother's care based upon neglect was a precipitating event from which the modification proceeding terminating Mother's parental rights began and from which J.H. was placed with his relatives. *See generally In re B.C.*, No. 04-14-00744-CV, 2015 Tex. App. LEXIS 4327, **11-12 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.) (In a case where appellant-father argued the Department did not prove that the alleged abuse or neglect under section 161.001(1)(O) was "at the hands of a parent[,]" the trial

15

court concluded that the evidence was factually sufficient to support termination under subsection (O) where, although the children were subsequently removed from aunt's home for abuse of one of the children, the children's earlier removal from mother's home based on neglect was the "precipitating event from which the termination proceedings began and from which the children were placed in Aunt's home."). Furthermore, Mother does not challenge on appeal the trial court's finding that the October 29, 2013 Order for Protection of a Child in an Emergency (wherein the Department was appointed J.H.'s temporary managing conservator for the second time) was necessary because of Mother's continued neglect.

On this record, the trial court could have determined that, considering evidence of Mother's neglect of J.H. that resulted in the 2010 removal, Mother's continued neglect of J.H. after he was voluntarily placed with a relative, and Mother's failure to complete her service plan during the pendency of the suit, the Department presented clear and convincing evidence supporting termination under section 161.001(O). We conclude that there is sufficient evidence that Mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the J.H. who had been in the conservatorship of the Department for more than nine months and had been removed due to abuse or neglect. Issue one is overruled.

BEST INTEREST OF THE CHILD

In Mother's second issue, she challenges the sufficiency of the evidence supporting the finding that termination of her parental rights is in J.H.'s best interest. The Texas Supreme Court has recognized a non-exhaustive list of factors that are pertinent to the inquiry of whether termination of parental rights is in the best interest of the child including: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307 (West 2014). No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in the child's best interest. *See In re A.P.*, 184 S.W.3d 410, 414-15 (Tex. App.—Dallas 2006, no pet.). The best interest determination may rely on direct or circumstantial evidence, subjective factors, and

17

the totality of the evidence. *See In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).

With respect to the trial court's finding that termination of Mother's parental rights was in J.H.'s best interest, Mother asserts that, when considering the *Holley* factors, the State failed to produce sufficient evidence at trial to overcome the strong presumption that J.H.'s best interest is served by not terminating Mother's parental rights because both the caseworker and the CASA testified that the evidence showed J.H. had expressed his desires to maintain a relationship with his mother and siblings. Mother argues that the attorney ad litem appointed for J.H. advocated that termination of Mother's rights was not in the child's best interests; that the CASA testified that J.H. was struggling with his current placement due to lack of contact with Mother; that there is no evidence that the existing parent-child relationship is improper; and that Mother's health problems affected her ability to complete her service plan and that "[i]t was clear to the caseworker that [Mother] was suffering from a chronic illness."

The trial court could have considered the affidavits in support of the 2010 and 2013 removals discussing Mother's continued neglect of J.H. during the pendency of the case, as well as other evidence in the record including, among other things, the caseworker's testimony. The trial court heard the testimony of the

18

CPS caseworker who testified that Mother had not demonstrated a willingness or ability to protect J.H. from harm or to put J.H.'s needs ahead of her own, that Mother was unable to provide J.H. with a safe and stable home, that J.H.'s behavior and demeanor are suffering because he does not have permanency, and that once the visitations between Mother and J.H. ceased, Mother never brought up visitation again or asked that visitation be reinstated. The trial court could have also considered the CASA's testimony. The CASA supported the cessation of the visits between Mother and J.H. after the CASA saw the detrimental effect on J.H. after Mother's failure to attend the visits. The trial court also heard testimony that J.H.'s therapist had recommended that the visits between J.H. and Mother cease.

The record does not support Mother's assertion that the attorney ad litem "advocated" against termination. The portion of the reporter's record from trial to which Mother cites on appeal for this assertion provides the following:

> [Ad Litem]: I think the evidence is undisputed that the child, [J.H.], wants contact with his mother in some form, whether by phone or in person. And no matter what legal vehicle will get him there, he's desperate for that contact. And I think that came through in the witnesses that we had. He has asked me to ask you for that contact and that's what I'm doing now.
>
> THE COURT: Want to ask you as attorney ad litem . . . .
> [T]he way I see it, we have three options in most of these cases as well as this case: And that is, return the child to the parent or parents and deny the Department's requests;

Secondly, appoint the Department PMC without termination and appoint the parents possessory conservators with visitation;

Third, terminate the parents['] [parental rights] and appoint the Department PMC.

You're advocating for the child. What does the child want?

[Ad Litem]: Your Honor, the child wants contact with his mother. He knows he can't live there.

I think that Option A, returning to the parent, is unsupported and I think it's realistic for the child and he knows that is not possible in the case at this time. So I think that's completely off the table.

With regard to the other two, he just wants contact. Whether that's done through the Department allowing contact post-termination/pre-adoption even, if an accommodation could be made to that sort. He wants any kind of contact he could get, even if were for purposes of closure or just knowing that he has the opportunity to speak with her.

THE COURT: Thank you.

The attorney ad litem did not advocate "against termination." Rather, the attorney ad-litem merely stated that J.H. had expressed an interest in having the opportunity to speak to Mother after termination or pre-adoption. And, the attorney ad-litem testified that termination is in the best interest of J.H.

The record citation Mother provides for her contention that "[t]he CASA advocate also testified that the child was struggling with his current placement due to his lack of contact with his mother" references the CASA's testimony that the dynamic in the foster home is "not very good" because the other foster children in the foster home have contact with their parents and J.H. "wonders why he can't

20

have contact with his mother." The CASA explained that J.H.'s incidents of bad behavior at home or school "seem to correspond with when the other children have contact with their parents." The CASA attributed J.H.'s bad behavior to his "awareness that he does not have a permanent home or a permanent person who is dedicated to him, who loves him." The trial court heard the CASA testify that she had visited J.H. in the foster home once or twice a month since November 2013, and further that J.H. did not ask the CASA about Mother until a year later, five months after the visitations between J.H. and Mother had ceased. And, the CASA testified that termination of Mother's parental rights is in the best interest of J.H.

With respect to Mother's argument that her health condition resulted in repeated hospital stays and that it was clear to the caseworker that Mother was suffering from a chronic illness, the trial court could have considered the caseworker's testimony, along with the testimony from the CASA. According to the caseworker, Mother did not provide proof that her hospital stays or illness was the reason she was unable to complete her service plan. The CASA testified that she had never received any evidence from Mother that she could not participate in a service because she was in the hospital and that the CASA thought that Mother was "choosing not to do what she need[ed] to do." However, the CASA also explained that she overheard Mother tell the caseworker that she could not get to

counseling because she did not have a ride and that she was sick and could not go. According to the CASA, she and the caseworker had offered to arrange transportation for Mother on several occasions if she needed it, and that Mother did not provide proof that her illness was the reason for her failing to attend counseling. The trial court also heard the CASA testify that, even considering Mother's health issues, Mother was given sufficient opportunity to complete her services and that the caseworker went "above and beyond to provide Mother with services. Furthermore, the trial court could have considered that the caseworker and the CASA believed it was in J.H.'s best interest to terminate Mother's parental rights to J.H.

After considering the relevant *Holley* factors, we conclude that the trial court reasonably could have formed a firm belief or conviction that termination was in the best interest of J.H. *See J.F.C.*, 96 S.W.3d at 266. Viewing all of the evidence, the disputed evidence is not so significant that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *See id*. Based on our review of the entire record, the trial court could reasonably have formed a firm belief or conviction termination of Mother's parental rights is in the best interest of J.H. We conclude that the evidence is both legally and factually sufficient to

support the best interest finding. We overrule Mother's second issue. The trial court's judgment is affirmed.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on July 27, 2015
Opinion Delivered August 31, 2015

Before McKeithen, C.J., Horton and Johnson, JJ.