Opinion issued October 27, 2016



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00439-CV

————————————

## IN THE INTEREST OF N.K.T.

---

On Appeal from the 315th District Court
Harris County, Texas
Trial Court Case No. 2015-02248J

---

## MEMORANDUM OPINION

Following a bench trial, the trial court signed a judgment terminating the parent-child relationship between C.D.T. and his one-year-old daughter, N.K.T. Father identifies two issues on appeal, asserting that the evidence was not legally or factually sufficient to support the trial court's judgment.

We affirm.

**Background**

On February 12, 2015, the Department of Family and Protective Services ("the Department") received a referral regarding one-year-old J.L.W. The Department learned that J.L.W.'s mother ("Mother") had called the mental health crisis hotline seeking mental health services. Mother, who suffers from schizophrenia, reported to the hotline that she was feeling violent and having homicidal thoughts. The report also stated that Mother was 37 or 38 weeks pregnant and was having difficulty caring for one-year-old J.L.W. The report stated Mother had not had mental health care since July 2014 and had been off her psychiatric medication for two years.

In a follow-up investigation, the Department learned that, in January 2015, when she was 36 weeks pregnant, Mother had stabbed Father in the neck with a knife. At that time, Father had punched Mother in the face, grabbed her arm, elbowed her in the back, and scratched her face. Father was arrested for assault family violence. Mother obtained a protective order against Father from the criminal court.

Mother gave birth to N.K.T. on February 26, 2015. Father is N.K.T.'s biological father. J.L.W. has a different father, who is deceased.

After the initial referral, the Department continued to monitor the family. On April 13, 2015, the Department filed suit, requesting the trial court to issue

temporary orders appointing the Department as temporary sole managing conservator of one-year-old J.L.W. and one-month-old N.K.T. If family reunification could not be achieved, the Department sought to terminate the parent-child relationship between the children and their respective parents. To support its requested relief, the Department offered the affidavit of its representative, Cheryl Bourda.

In her affidavit, Bourda indicated that Mother was not taking her psychiatric medication and had not sought follow-up mental health treatment for her schizophrenia. She said that Mother denied having homicidal thoughts but reported she was "still hearing voices." Both parents minimized the previous domestic violence that had occurred between them. Bourda stated that Mother and Father were in an "unstable living condition," residing with Father's aunt in an apartment where they were at risk for eviction. Bourda also noted that, by living together, Mother and Father were violating the protective order issued after Father assaulted Mother.

Bourda also expressed concern that one-month-old N.K.T. was not being cared for properly. Father had reported nearly injuring N.K.T. in his sleep because the parents were "co-sleeping" with the infant. Bourda stated that the parents continued to "co-sleep" with N.K.T. despite being instructed to cease. Bourda concluded the affidavit by stating that "[b]oth [parents] continue to demonstrate

bad judgment [by] placing their children in continuous risk of harm due to domestic violence and untreated serious mental health issues."

The same day the petition was filed, the trial court signed emergency temporary orders, naming the Department as temporary sole managing conservator of the children. N.K.T. was placed in foster care, and J.L.W. was placed with his paternal grandmother. Eventually, N.K.T. was also placed with J.L.W.'s grandmother.

The trial court held a full adversary hearing on May 18, 2015. Neither Mother nor Father appeared at the hearing, but each were represented by appointed counsel. The trial court signed an order, reaffirming the Department as the children's sole managing conservator.

The Department filed a family service plan for both parents with the trial court. The plan stated that its "permanency goal" was family reunification. The target date for reunification was April 18, 2016.

The court conducted a status hearing on June 15, 2015. Again, Mother and Father did not personally attend, but counsel appeared for each parent. The trial court made the following findings with respect to Father, who is the only parent appealing the trial court's judgment in this case:

> 2.5 The Court, having reviewed the service plans filed by the Department, finds, except as specifically noted below, that the service plans are reasonable, accurate, and in compliance with the previous orders of the Court.

4

2.6 The Court finds that the goal of the service plans is to return the children to the parent, and the plans adequately ensure that reasonable efforts are being made to enable the parent to provide a safe environment for the children.

. . . .

2.8 The Court finds that [Father] has not reviewed and does not understand the service plan and has not been advised that unless he is willing and able to provide the children with a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan, his parental and custodial duties and rights may be subject to restriction or to termination or the children may not be returned to him.

The trial court also ordered that "the plans of service for [Father] filed with the Court, and incorporated by reference as if the same were copied verbatim in this order, [are] APPROVED and made an ORDER of this Court." By its order, the trial court also approved a family service plan for Mother.

Father signed the family service plan on June 24, 2015. The service plan informed Father:

TO THE PARENT: THIS IS A VERY IMPORTANT DOCUMENT. ITS PURPOSE IS TO HELP YOU PROVIDE YOUR CHILD WITH A SAFE ENVIRONMENT WITHIN THE REASONABLE PERIOD SPECIFIED IN THE PLAN. IF YOU ARE UNWILLING OR UNABLE TO PROVIDE YOUR CHILD WITH A SAFE ENVIRONMENT, YOUR PARENTAL AND CUSTODIAL DUTIES AND RIGHTS MAY BE RESTRICTED OR TERMINATED OR YOUR CHILD MAY NOT BE RETURNED TO YOU. THERE WILL BE A COURT HEARING AT WHICH A JUDGE WILL REVIEW THIS SERVICE PLAN.

The service plan also advised Father that his progress on the plan would be evaluated based on (1) whether he completed the tasks identified in the plan, (2) whether he had achieved the goals in the plan, and (3) whether he could "provide for the ongoing safety and well-being of [N.K.T.]."

The service plan informed Father that the Department had the following concerns:

Both [children] are under the age of 5 years old. [J.L.W.] is one and [N.K.T.] is a new born.

[Mother] is schizophrenic and not taking meds. She admits to still hearing voices. She may be homicidal. She has abuse [and] neglect history as a child. [Mother and Father] continue to co-sleep with [N.K.T.] after warnings. Possible drug use by Father as he has previous drug charges.

. . . .

[Mother] is a victim of domestic violence as [Father] punched her in the face recently at 36 weeks pregnant. She is also an aggressor as she stabbed [Father] in the neck earlier this year. They are co-sleeping with [N.K.T.] even after warnings [not to do so]. They have violent behavior and criminal history. . . .

Family is downplaying the situation. They lied about domestic violence. They are violating protective order. They take warnings lightly. Even gave [Mother] a chance to get her medications and she did not, and changed her story. Family is deceitful. Family has been told what to do, via safety plan, then afterwards for [Mother] to get evaluated and both to drug test, . . . which they have not done.

They are unconcerned about [Mother] not being on meds, and think she is fine. [Mother] is unwilling to protect her child from domestic violence, as she and [Father] broke the order of protection and she

6

moved in with him.  [Father] is not protective, as when [Mother] stabbed in the neck, he lied stating he did not know who did it.  He appears unconcerned as well as he admits to having a co-sleeping experience where he almost [hurt N.K.T.] but continues [to] co-sleep [with N.K.T.].

The service plan also stated the "goals" or "changes needed to reduce risk"

for Father, including the following:

[Father] will demonstrate the willingness and ability to protect the child from harm.

[Father] will demonstrate the ability to communicate with spouse or support system to deal with everyday problems.

[Father] will learn to control angry feelings and actions to prevent harm to others.

[Father] will demonstrate an ability to provide basic necessities such as food, clothing, shelter, medical care, and supervision for the child.

[Father] will demonstrate the ability to put the needs of the children ahead [his] own.

[Father] will demonstrate the ability to protect child from future abuse or neglect, and will show concern for future safety of the child.

[Father] will understand the cycle of violence and learn how to protect [himself] and the children.

[Father] will alter behaviors that expose the children to risk of harm.

[Father] will actively cooperate in fulfilling the agreed upon safety plan in order to control the risk of abuse or [Father] will demonstrate an ability to change the pattern of behaving that resulted In abuse/neglect.

[Father] will demonstrate ability to protect the child from harm.

7

[Father] will understand the serious nature of the situation that placed the child in harm's way.

To meet these goals, the service plan required Father to complete the following tasks and services: (1) complete parenting classes and "demonstrate the learned behaviors during family visits"; (2) fully participate in a drug and alcohol assessment; (3) develop and maintain a positive social support network; (4) cooperate with the Department and maintain contact with the CPS caseworker; (5) demonstrate the ability to place N.K.T.'s needs above his own; (6) refrain from illegal activity; (7) sign a release to enable the Department to receive information from service providers; (8) acquire and maintain a telephone to enable the Department's caseworker and the service providers to contact Father; (9) maintain a legal form of employment; (10) notify the CPS caseworker if he is arrested; (11) maintain stable housing for six months; (12) participate in a psychological assessment; (13) attend court hearings; (14) complete individual and family counseling; (15) participate and complete anger management classes; and (16) participate in domestic violence classes.

The trial court held a permanency hearing on November 18, 2015. The parents did not personally appear, but both were represented by counsel. In its permanency order, the trial court found that neither parent had "demonstrated adequate and appropriate compliance with the service plan." The trial court again

8

approved and adopted the parents' service plans as an order of the court. The trial court further ordered,

> The actions specified in each service plan . . . on file as of the date of this order represent actions which this Court requires of the parent specified in the service plan . . . and the actions must be performed in order for the parent to regain custody of the children who are presently in the temporary managing conservatorship of the Department.

The Department's caseworker, Iris Darrington, prepared a permanency report for the trial court, which she signed on February 11, 2016. In the report, Darrington stated that the Department's goal with respect to N.K.T., when the case began, was to reunite the family. Reunification was conditioned on the parents demonstrating that they could meet her needs and keep her safe.

Under the heading "parental progress," Darrington stated that neither Mother nor Father had begun or completed any of the services required in his or her service plan. With respect to Father, Darrington wrote, "[Father] has received a detailed visitation plan that reflects specific dates, location and times in which he will visit with his children. [Father] has not participated in any scheduled visitation."

The Department pursued termination of the parent-child relationship between Mother and J.L.W. and N.K.T. and between Father and N.K.T. On April 11, 2016, the case was tried to the bench. Neither Mother nor Father attended trial, but each were represented by counsel.

Caseworker Darrington testified regarding Mother's history of untreated mental health problems and about the couple's history of domestic violence. With regard to the service plans, Darrington stated that the plans had been provided to the parents but that neither Father nor Mother had completed the services identified in the plans. The only service completed by Mother was submitting to drug assessment. During the drug assessment, Mother admitted to using marijuana and confirmed that she was not taking her psychiatric medication. Darrington stated that Mother never followed the drug assessment's treatment recommendations.

Darrington also testified that Father completed none of the services identified in his service plan. Darrington confirmed that the Department made the necessary referrals for Father to complete the services. She stated that Father also had not provided the Department with proof of employment or stable housing. Darrington testified that Mother and Father are still in a relationship and continue to live together, even though this violated the criminal court's protective order. Darrington stated that the parents could not provide a safe home for the children.

When asked about Father's visitation with N.K.T., Darrington testified, "[Father] was provided an opportunity twice a month for two hours. However, he never showed for any of the visits and then later on the visits were suspended." Darrington confirmed that, in the six months preceding trial, Father had not visited N.K.T. Darrington stated that she had spoken with Father one month earlier. She

10

asked Father if he had made appointments to engage in services. Father told her he had made appointments. Darrington later confirmed with the service providers that Father never engaged in services.

Darrington further stated that Father had indicated that he wanted N.K.T. to be placed with his family. Darrington testified that she had contacted Father's mother and his aunt; however, neither responded to Darrington. She stated that Father's mother and aunt "did not provide any information so we could conduct the home study in order to place the children."

Darrington also testified that, at the last court hearing, on March 2, 2016, she met with Mother and Father. She stated that "[t]the nature of that meeting was that we were . . . continuing to go over that service plan. I let them know what locations there were and that their 2054s were still valid." Darrington testified that Mother and Father appeared receptive at that time to engage in services. However, Father did not engage in of any of the services required for him to reunite with N.K.T.

Darrington testified that J.L.W. and N.K.T. are living with J.L.W.'s paternal grandmother, Rhonda. She stated that both children are doing well in the grandmother's home and have bonded with her. Darrington confirmed that the grandmother wishes to adopt the children.

Etta Pickett of Child Advocates testified next. She stated that she had tried to make contact with Mother and Father several times since the last court hearing, but they had not called her back. She stated that Mother and Father never had a home of their own and had been living with other people "place to place." Pickett agreed with Darrington that J.L.W. and N.K.T. were "doing really good" and "thriving" in their placement with Rhonda.

Rhonda also testified. She confirmed that neither Mother nor Father had seen the children since they were removed from the parents' care in April 2015. She stated that the parents "don't even call and ask about the kids. No happy birthdays. No Christmas presents. They don't do anything."

Rhonda testified that she and the children have an emotional bond. Rhonda stated that, even though N.K.T. was not her biological grandchild, she treats her "just like she is my own." Rhonda testified that she wishes to adopt both children.

The State also offered a number of exhibits into evidence, including the trial court's temporary orders, the status-hearing order, the family service plan signed by Father, the permanency report, and judgments of conviction showing that Father had past convictions for a number of offenses, including drug possession, burglary, and assault family violence. The State also showed Mother had convictions for trespass and deadly conduct.

At the end of trial, the trial court rendered judgment terminating the parent-child relationship between Mother and her two children and terminating the parent-child relationship between Father and N.K.T. With respect to Father, the trial court found that termination was in N.K.T.'s best interest and that Father had engaged in the predicate acts listed in Family Code Subsections 161.001(b)(1),(N) and (O). Specifically, the trial court found that clear and convincing evidence showed (1) Father had constructively abandoned N.K.T. (Subsection (N)), and (2) Father had failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of N.K.T. (Subsection (O)). The trial court also appointed the Department to be N.K.T.'s sole managing conservator.

Father now appeals the trial court's judgment. Mother does not appeal.

## Sufficiency of the Evidence

In two issues, Father asserts that the evidence was legally and factually insufficient to support the trial court's predicate findings under Subsections (N) and (O).

### A. Standard of Review

Termination of parental rights requires proof by clear and convincing evidence. *See* TEX. FAM. CODE ANN. 161.001(b) (Vernon Supp. 2015). This heightened standard of review is mandated not only by the Family Code but also

by the Due Process Clause of the United States Constitution. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *see also Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S. Ct. 1388, 1394–95 (1982) (recognizing fundamental liberty interest parent has in his or her child and concluding that state must provide parent with fundamentally fair procedures, including clear and convincing evidentiary standard, when seeking to terminate parental rights). The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *see J.F.C.*, 96 S.W.3d at 264. Here, the Department was required to establish, by clear and convincing evidence, that Father's actions satisfied one of the predicate grounds listed in Family Code section 161.001(b)(1) and that termination was in N.K.T.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1), (2).

When determining legal sufficiency, we review all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* We disregard all evidence

that a reasonable fact finder could have disbelieved or found to have been not credible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* The disregard of undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all of the evidence, not only that which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to reasonably form in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact

finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

We are mindful that the natural rights that exist between parents and their children are of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* at 20–21; *see In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012). However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26; *see In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013).

## B.     Subsection 161.001(b)(1)(N)

In his second issue, Father contends the evidence is insufficient to support the trial court's finding that he committed acts establishing the predicate termination ground set out in Subsection 161.001(b)(1)(N) of Family Code. Under

16

that provision, a court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has

> (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months, and:
>
>> (i) the department or authorized agency has made reasonable efforts to return the child to the parent;
>>
>> (ii) the parent has not regularly visited or maintained significant contact with the child; and
>>
>> (iii) the parent has demonstrated an inability to provide the child with a safe environment.

TEX. FAM. CODE ANN. § 161.001(b)(1)(N).

On appeal, Father does not challenge the sufficiency of the evidence to show, at the time of trial, (1) N.K.T. had been in the Department's conservatorship for more than six months; (2) Father had failed to regularly visit or maintain contact with N.K.T. for six months; or that (3) he had demonstrated an inability to provide N.K.T. with a safe environment. Instead, Father asserts that the evidence was not legally or factually sufficient to support the trial court's finding that the Department made reasonable efforts to return N.K.T. to Father. The family service plan is key to that finding.

A family service plan is designed to reunify a parent with a child who has been removed by the Department. *Liu v. Dep't of Family & Protective Servs.*, 273

S.W.3d 785, 795 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Father acknowledges that implementation of a service plan is ordinarily considered a reasonable effort to return a child to her parent for purposes of Subsection (N). *See In re A.T.L.*, No. 04–15–00379–CV, 2015 WL 6507807, at *5 (Tex. App.—San Antonio Oct. 28, 2015, pet. denied); *In re N.R.T.*, 338 S.W.3d 667, 674 (Tex. App.—Amarillo 2011, no pet.); *M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 310–11 (Tex. App.—El Paso 2009, pet. denied).

Father acknowledges that the Department "provided him" with a service plan. Nonetheless, Father argues that the service plan did not satisfy the reasonable-effort-to-unite-parent-child requirement because "merely providing him with [the service plan] is insufficient to prove reasonable efforts were made to return N.K.T. to him." Father intimates that, for it to satisfy the reasonable-efforts requirement, the Department needed to show that the service plan's implementation comported with the provisions of Family Code sections 263.102 and 263.103, which pertain to the preparation and administration of service plans. *See* TEX. FAM. CODE ANN. § 263.102 (Vernon Supp. 2016), § 263.103 (Vernon Supp. 2016). However, as aptly noted by one court, "In reviewing the sufficiency of the evidence supporting termination under Section 161.001(1)(N), the issue is whether the Department made reasonable efforts, not ideal efforts." *In re S.R.*, No. 12–14–00238–CV, 2015 WL 302493, at *2 (Tex. App.—Tyler Jan. 23, 2105, pet.

denied); *see also In re M.V.G.*, 440 S.W.3d 54, 61 (Tex. App.—Waco 2010, no pet.) (recognizing, in conducting sufficiency analysis of reasonable-efforts requirement, that "there probably are things the Department could have done differently [when implementing mother's service plan], but the issue is whether the Department made '*reasonable* efforts'").

Here, the evidence showed that the Department prepared and then filed a service plan with the trial court that explained the Department's concerns with Father's inability to provide N.K.T. with a safe environment. The plan stated that its goal was to reunify Father with N.K.T., and it detailed the actions Father needed to take in order to obtain N.K.T.'s return. The plan made clear that the parental relationship between Father and N.K.T. could be terminated if he did not complete the services listed in the plan. The evidence showed that Father signed the service plan on June 24, 2015, nearly 10 months before trial.

In addition, the February 2016 permanency plan, filed with the trial court, showed that the Department provided Father with "a detailed visitation plan that reflects specific dates, location and times in which he will visit" N.K.T. The report informed the trial court that "[Father] has not participated in any scheduled visitation."

Caseworker Darrington testified that she had made the referrals needed for Father to complete the services identified in his plan. Darrington testified that,

when she spoke with him on the telephone about completing the services, Father indicated that he had made appointments to engage in services. After that, Darrington learned from the service providers that Father had not engaged in services. Darrington also stated that she met with the parents at a hearing one month before trial to continue to review the service plan. Darrington's testimony indicated that she told the parents where to go for services. Darrington further testified that, in addition to the service plan, she provided the parents information regarding government assistance and public housing. She stated that the parents had made no effort to utilize the services.

Darrington also testified that the Department has given Father an opportunity to visit N.K.T. twice a month for two hours, but "he never showed for any of the visits." Rhonda, who has been caring for N.K.T. while the case was pending, also confirmed that Father never initiated any type of contact regarding N.K.T. Child advocate Pickett testified that she had tried to contact the parents, but they would not return her messages.

Despite the foregoing evidence of the Department's reasonable efforts to reunite him with N.K.T., Father asserts on appeal that the service plan cannot support a reasonable-efforts finding because he did not understand the service plan at the time the trial court approved and adopted it in its June 15, 2015 status-

hearing order.[1]  *See* TEX. FAM. CODE ANN. § 263.102 (providing in subsections (a)(1),(2) and (d) that service plan should be specific and written in a manner the parent can understand).  Father points out that he did not attend the status hearing.  He stresses that the trial court expressly found in its June 15, 2015 status-hearing order that he had not reviewed the service plan, and he did not understand it at that time.

Father is correct that the record shows that he did not attend the June 15, 2015 status hearing.  However, the record also shows that Father was represented

---

[1]     Father did not raise his complaints about the service plan's alleged non-compliance with Family Code Sections 263.102 and 263.103 in the trial court.  In its brief, the Department asserts that Father has waived his right to complain about these deficiencies on appeal.  *See* TEX. R. APP. P. 33.1(a) (providing, to preserve complaints for appeal, party must make a timely, specific objection in trial court and obtain a ruling on objection).  We note that one court has held, to preserve a procedural-due-process complaint on appeal, arising from a claim—analogous to the one here—that a parent did not sign or understand the service plan, the complaint must first have been raised in the trial court.  *See In re C.N.S.*, No. 14–14–00301–CV, 2014 WL 3887722, at *7 (Tex. App.—Houston [14th Dist.] Aug. 7, 2014, no pet.) (mem. op.).  In this case, Father has not raised a due-process complaint.  Instead, Father frames his appellate issue as a legal-and-factual-sufficiency-of-the-evidence challenge to the trial court's finding that the Department made reasonable efforts to unite him with N.K.T., as required under Subsection (N).  In contrast to due-process complaints, sufficiency-of-the-evidence complaints may be made for the first time on appeal when arising from a bench trial.  *See* TEX. R. APP. P. 33.1(d).  As mentioned, this case was tried to the bench.  Because his appellate complaint is brought as a legal-and-factual-sufficiency-of-the-evidence challenge, we will analyze it under those standards.  *Cf. In re G.S.*, No. 14–14–00477–CV, 2014 WL 4699480, at *9 (Tex. App.—Houston [14th Dist.] Sept. 23, 2014, no pet.) (mem. op.) (holding, in a sufficiency-of-the-evidence review of a reasonable-efforts-to-unite-parent-child finding, that father had waived his complaint that caseworker had not explained service plan to him when he had not raised it in trial court, but appellate court nonetheless conducted sufficiency-of-the-evidence review of that point).

by counsel at that hearing and every other hearing reflected in the record. In addition, while the June 15 order, initially approving and adopting the service plan, reflects that the trial court found that Father had not reviewed the plan and did not understand it, the record also reflects that Father signed the service plan nine days later on June 24, 2015.[2] By signing the plan, Father indicated that he understood and agreed to its terms. The record further shows that the trial court reaffirmed its approval and adoption of the service plan in its November 18, 2015 permanency order, rendered after Father had signed the service plan.

In his brief, Father also asserts that the evidence did not show that the service plan had been prepared in consultation with him or that the Department's

---

[2] Father also raises the complaint that, because he was not present at the June 15, 2015 hearing, he was not admonished pursuant to Family Code Section 263.102(b), which requires the service plan to contain the following language:

> TO THE PARENT: THIS IS A VERY IMPORTANT DOCUMENT. ITS PURPOSE IS TO HELP YOU PROVIDE YOUR CHILD WITH A SAFE ENVIRONMENT WITHIN THE REASONABLE PERIOD SPECIFIED IN THE PLAN. IF YOU ARE UNWILLING OR UNABLE TO PROVIDE YOUR CHILD WITH A SAFE ENVIRONMENT, YOUR PARENTAL AND CUSTODIAL DUTIES AND RIGHTS MAY BE RESTRICTED OR TERMINATED OR YOUR CHILD MAY NOT BE RETURNED TO YOU. THERE WILL BE A COURT HEARING AT WHICH A JUDGE WILL REVIEW THIS SERVICE PLAN.

TEX. FAM. CODE ANN. § 263.102(b) (Vernon Supp. 2015).

While Father was not personally given that admonishment at the hearing on June 15, the required language was included in the service plan signed by Father on June 24, 2015. Thus, the statutory requirement that it be included in the plan was met.

22

caseworker had discussed or explained the terms and conditions of the plan to him before he signed it. *See id.* § 263.102(a)(3) (providing service plan should "be prepared by the department in conference with the child's parents"); *id.* § 263.103(a) ("The original service plan shall be developed jointly by the child's parents and a representative of the department, including informing the parents of their rights in connection with the service plan process. . . ."). He points out that the record shows that he had not been consulted because the plan was initially approved without his review or his signature.

Even though he did not sign it at the time of its preparation, there is at least some evidence that the Department spoke with Father about its content during the plan's development. In the plan, under the heading "Hopes and Dreams for the Child(ren)," is the notation: "[Father] hopes that [J.L.W.] and [N.K.T.] become successful individuals and continue with their education." *See G.S.*, No. 14–14–00477–CV, 2014 WL 4699480, at *9 (Tex. App.—Houston [14th Dist.] Sept. 23, 2014, no pet.) (mem. op.) (rejecting parent's contention that the Department had not satisfied reasonable-efforts requirement with implementation of its service plan; parent had based challenge on assertion that caseworker had not reviewed service plan with him; in rejecting challenge, court relied, in part, on evidence regarding what parent had told the Department about his plans and his wishes for child's future to show caseworker had reviewed plan with him). Additionally, on

23

the signature page of the plan signed by Father, was the statement: "I understand I may request a review or change of this plan or an evaluation of my progress at any time."

Father further asserts that the evidence did not show that Darrington had timely made the referrals to the service providers, which were necessary for him to complete the services required under the plan. We disagree. When questioned whether "the proper referrals" were made for Father, Darrington testified, "That is correct."

In addition, Darrington stated that she spoke to Father on the phone one month before trial about making appointments with the service providers, raising an inference that the referrals were in place. Darrington also testified that, when she met with the parents one month before trial, "their 2054s were still valid," which from the context of Darrington's entire testimony, indicated that the authorizations for the parents to engage in services were "still valid," raising an inference that the authorizations had been in place for some time at that point.

Lastly, the evidence showed that the Department took action to place N.K.T. with Father's relatives. Darrington testified that she "reached out" to Father's mother and aunt to inquire whether N.K.T. could be placed with them. Darrington testified that neither relative responded to her. Darrington indicated that, because they did not provide any information to her, the Department could not conduct a

home study to determine whether either relative was a suitable placement for N.K.T.

Based on our review of the record, we conclude that, when viewed in the light most favorable to the termination findings under subsection N, the evidence—including evidence of the Department's implementation of the service plan, the Department's providing Father with a visitation schedule, and the Department's action attempting to place N.K.T. with Father's relatives—shows that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the finding that the Department made reasonable efforts to return N.K.T. to Father. We further conclude that, when viewed in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding that the Department made reasonable efforts to return N.K.T. is not so significant that a fact finder could not reasonably have formed a firm belief or conviction as to the truth of this termination finding. Accordingly, we hold that the evidence was legally and factually sufficient to support the trial court's judgment, terminating the parent-child relationship between Father and N.K.T. *See id.*; *In re V.D.A.*, No. 14–14–00561–CV, 2014 WL 7347776, at *6–7 (Tex. App.—Houston [14th Dist.] Dec. 23, 2014, no pet.) (mem. op.) (holding evidence was sufficient to support a finding that the Department made reasonable efforts to return child to parent even though father denied knowledge of his service plan, claimed that he

never received a copy of the plan, and disputed that caseworker discussed plan with him); *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.) (holding Department showed it made reasonable efforts to return child to parent when it prepared service plans and made efforts to work with parent on plans); *see also H.N. v. Dep't of Family & Protective Servs.*, 397 S.W.3d 802, 810 (Tex. App.—El Paso 2013, no pet.) (considering testimony showing Department's evaluation of other family members' homes as possible placements as part of Department's reasonable efforts to return child).

We overrule Father's second issue.[3]

## Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Huddle.

---

[3] Because only one predicate ground is needed to support a termination order, we need not address Father's first issue, which challenges the sufficiency of the evidence to support the trial court's finding under Subsection 161.001(b)(1)(O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (recognizing, "Only one predicate finding" under section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").